**Item #10**

19

1    MR. STEINBERG: That's resolved, and they dropped the
2 litigation that they commenced but was automatically, which was
3 the estate's causes of action against the directors and
4 officers. It's not a complete resolution of everything, and I
5 have obviously between now and April 23rd to try to deliver a
6 full peaceful resolution, but in considering the price tag that
7 we had to pay and the cost that the Premiere Committee has
8 called the collective estate -- caused the collective estates,
9 we think that this resolution is an appropriate resolution.
10   Now this piece broke at hand probably somewhere in
11 mid-afternoon yesterday, and out of fairness to the General
12 Unsecured Creditors Committee and the agent for the bank group,
13 we had our discussions with them. I think both of them will
14 stand up today and say they recommend this resolution, but
15 they, as good lawyers, need to be able to talk to a client to
16 be able to get their approval.
17   What we would asking Your Honor today is not to
18 approve the disclosure statement itself, but we will be
19 submitting an order two or three days from now with the
20 assumption that the Creditors Committee and the bank group have
21 agreed to this resolution with Premiere. If they don't, Your
22 Honor, besides pulling out some of my hair, we will come back
23 to Your Honor to try to figure out quickly how to put this
24 thing back on the right track that we're trying to do.
25   But that is the resolution of the Premiere objection

**Item #11**

Case 1:04-cv-00917-GMS     Document 11-4     Filed 03/24/2005     Page 3 of 18

1  changed circumstances.  And I would have to say, Your Honor,
2  that there was some momentum to not have a deal, to have a
3  different deal, but by Tuesday -- if today is Wednesday, by
4  Tuesday we came back to a structure that was pretty much
5  consistent with the prior deal with the following caveats:  the
6  plan would provide for a special class of creditors for the
7  Premiere Creditors of which the Bank Group wouldn't participate
8  in.  That group of creditors would get six cents on the dollar
9  to the extent that the group of claims was $22 million.  To the
10 extent that claims exceeded $22 million -- primarily because we
11 anticipate rejection damages claims -- that we would go back to
12 paying three cents on the dollar for the group and with an
13 overall cap of $37 million.  In effect, that would mean that if
14 the claims in this case and for the premiere Group was over $22
15 million, we would be paying the Premiere estate three cents on
16 the dollar plus $660,000 and they would share pro rata.
17         In exchange for that arrangement, Mr. Angel would
18 withdraw any rights for a substantial contribution relating to
19 the formation of the committee.  The committee would agree that
20 the estate causes of action related to whether the bank
21 guarantee should have been issued and whether the directors
22 should have signed the guarantees -- those estate causes of
23 action, one of which is subjudiced as to whether they should be
24 able to bring it; the other one was brought but immediately
25 stayed.  Those would be dismissed with prejudice.  Mr. Angel's

A000142

19

individual litigation against those same offices and directors for which we believe we have insurance coverage for would go forward in the North Carolina Court, and we would agree to a separate stipulation to allow that to go forward; although I think that there is a momentum between Mr. Angel's counsel, myself, and perhaps even the DNO carrier to figure out whether we can resolve that issue before confirmation.

     I will say to Your Honor that if that issue is not resolved there will be an issue in this case in that two of the officers, at least, that have been named in the North Carlina lawsuit have indemnity claims pursuant to agreements that were entered into post-petition relating to this litigation; so they would argue that they would have a post-petition indemnity claim. To the extent the addendum clause is very large and they move to try the damages, it could impact the distribution in the case. If we ever got to that point in time, Your Honor -- I'm not asking Your Honor to prejudge the issue -- but we would come to Your Honor and ask to have some estimation procedure so that this litigation does not tie up the entire matter. I will say, also, that the General Unsecured Creditors Committee's big sticking point in going forward with the deal is that I was not able to wrap up all of the issues. But unfortunately, this issue which relates to an individual third party claim against the nondebtors is something that I didn't think I could necessarily control as

A000143

**Item #12**

including without limitation section J thereof ('Replacements and Substitutions'); the SNH Entities shall have against the LTC Subsidiary and/or the Reorganized Debtors; all rights and remedies they have or may have against the Debtors arising under any of those items identified in (a) - (e) above; the Reorganized Debtors shall be owned directly by the LTC Subsidiary which, in turn, shall be owned by Briarwood; provided, that, except for the transfer or continuation of any obligations of the Debtors to the LTC Subsidiary and/or the Reorganized Debtors, nothing in this paragraph shall be construed as imposing liability on or limiting liability of any party beyond what would otherwise exist under applicable law; and it is further

ORDERED, that the objections raised in the Objections filed by HRES1 and FSQ, to the extent not resolved in this Order or on the record of the February 26, 2003 hearing or the March 12 hearing, are preserved until the hearing on confirmation of the Plan; and it is further

ORDERED, that nothing set forth herein shall prejudice the rights of Rio Rancho to object to any proposed assumption, sublease and/or assignment of the Debtors' leases with Rio Rancho to a third party, including without limitation, Briarwood or THI Holdings LLC, or to object to confirmation of the Plan; and it is further

ORDERED, that nothing contained herein shall be construed as effectuating a discharge of any third party, non-debtor claims asserted in that certain civil action, pending in the United States District Court for the Middle District of North Carolina, styled as *Don G. Angell, D. Gray Angell, Jr., and Don R. House, in their capacities as Co-Trustees of the Don Angell Irrevocable Trust Under Instrument Dated July 24, 1992, and Angell Care Incorporated, v. Elizabeth B. Kelly, C. Taylor Pickett, Daniel J. Booth and Ronald L. Lord,* [Case No. 01-CV-435].

**Item #13**

19. The Debtors and the Premiere Committee[10] agreed to a settlement between them which was contained in the Plan. Paragraph 69 of the Confirmation Order provides that as of the Effective Date, the motion filed by the Premiere Committee and the adversary complaint filed by the Premiere Committee against the officers and directors of IHS, including Booth, Pickett and Lord, "shall each be deemed to be dismissed with prejudice, and the Premiere Committee and the Debtors' estates shall be deemed to have permanently waived and relinquished any and all claims and causes of actions referred to in or contemplated by the Premiere Motion." (Confirmation Order, ¶ 69) Thus, as a result of the Premiere Settlement, five of the nine causes of action[11] asserted by the Angell Plaintiffs against the Officers, which belong to the Premiere estates, are being dismissed with prejudice. They cannot be reasserted by any creditor, including the Angell Plaintiffs, as direct claims in the Angell Lawsuit. To reserve for claims which will be dismissed on the Effective Date of the Plan makes no sense.

C. **IHS' By-Laws and Delaware Law**

20. Article 5 of IHS' by-laws permits indemnification for officers and directors who act in good faith and in a manner reasonably believed to be in or not opposed to the best interest of IHS.[12] Section 5.1 of the IHS by-laws provides that:

> The corporation shall indemnify any director of the Corporation holding the position of Senior Vice President or any higher office of

---

[10] Don Angell, one of the plaintiffs in the Angell Lawsuit, is a member of the Premiere Committee and supported the Premiere Settlement in the Plan.

[11] The non-overlapping claims in the Angell Lawsuit are Fraud (First Claim for Relief), Negligent Misrepresentation (Second Claim for Relief) and Unfair and Deceptive Trade Practices (Eighth Claim for Relief). In addition, the Angell Complaint also contains a claim for punitive damages, which while not an independent claim, is not sought as an element of damages in the adversary complaint.

[12] A copy of Article 5 of the IHS by-laws is attached as Exhibit C.

11

A000145

## POINT IV

### EVEN IF THE OFFICERS COULD ESTABLISH THAT SOME RESERVE WAS NECESSARY FOR THEIR BENEFIT, THE AMOUNT OF THAT RESERVE SHOULD BE SET AT A MINIMAL AMOUNT TO REFLECT THE LACK OF MERIT TO THE ONE ARGUABLY INDEMNIFIABLE CLAIM WHICH IS NOT BEING DISMISSED

43. Even if the Officers could somehow demonstrate that some reserve is necessary for their benefit, any such reserve should be limited to a minimal amount because, even if indemnifiable, the underlying claims lack merit. Of the nine claims asserted in the Angell Lawsuit, seven involve intentional conduct that is not indemnifiable either under IHS' by-laws or Delaware law. *See* Paragraph 27 *supra* and cases cited therein. The two remaining claims that are arguably indemnifiable under IHS' by-laws, and, in any event, would be covered by IHS' D&O insurance policy, are patently meritless claims and the prospects for success on those claims are demonstrably slim and fail to justify any significant reserve.

44. One of the two arguably indemnifiable claims, asserted only against defendant Pickett, is a claim for an unlawful distribution in violation of a North Carolina statute. That claim alleges that the execution by Premiere and its subsidiaries of the Joinder Agreements constituted an unlawful and illegal distribution of the assets of Premiere to IHS. (Amended Complaint, ¶ 42) This claim is a derivative claim that belongs to and can only be asserted by the Premiere estates and cannot be asserted by the Angell Plaintiffs as a direct claim. Moreover, that claim was previously asserted by the Premiere Committee in connection with the Premiere Lawsuit and, on the Effective Date, will be dismissed with prejudice by the Premiere Committee in connection with the Premiere

Settlement (Plan. § 10.9) Thus, it cannot be reasserted by the Angell Plaintiffs as a direct claim in the Angell Lawsuit.[27]

45. The other remaining Angell claim -- a claim for negligent misrepresentation -- is meritless for three reasons.[28] First, an essential element of a negligent misrepresentation claim is that the plaintiff actually and justifiably relied on the alleged misrepresentation. *See Brinkman v. Barrett Kays & Assocs. P.A.*, 75 S.E.2d 40, 43-44 (N.C. App. 2003) ("It has long been held in North Carolina that '[t]he tort of negligent misrepresentation occurs when (1) a party justifiably relies, (2) to his detriment, (3) on information prepared without reasonable care, (4) by one who owed the relying party a duty of care.'") (internal quotations and citations omitted). The Angell Plaintiffs could not have justifiably relied on any alleged misrepresentations for two reasons. First, the Angell Plaintiffs clearly had access to IHS' revolving credit agreement with Citibank because IHS was a public corporation and its credit agreement was disclosed in its publicly available SEC filings. *See Oberlin Capital, L.P. v. Slavin*, 554 S.E.2d 840, 846 (N.C. App. 2001) ("when the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint

---

[27] Moreover, four other claims asserted by the Angell Plaintiffs in the Angell Lawsuit belong to the Premiere estates and have already been asserted by the Premiere Committee in the Premiere Lawsuit. Those claims will be deemed dismissed with prejudice on the Effective Date. While none of those claims of breach of fiduciary duty, constructive fraud, unlawful transfer, unlawful distributions and unauthorized execution is indemnifiable under IHS' by-laws or covered by insurance, they cannot, in any event, be asserted as direct claims by the Angell Plaintiffs in the Angell Lawsuit.

[28] Moreover, a careful review of the Angell Lawsuit reveals that the so-called misrepresentations made in connection with the Premiere merger (and allegedly the basis of the purported negligent misrepresentation claim) were allegedly made by defendants Kelly and Pickett – not Booth or Lord. All defendant Lord allegedly did was sign the Joinder Agreement on behalf of the Premiere subsidiaries (Amended Complaint, ¶ 21) and all defendant Booth allegedly did was sign the Joinder Agreement on behalf of Premiere (Amended Complaint, ¶ 22) and somehow participate in making what were truthful representations in the IHS Guaranty (Amended Complaint, ¶ 20)

23

**Item #14**

27

1       So, what you heard from Mr. Jordan was that they
2  have not filed an administrative claim for an indemnity yet,
3  there is nothing that the Debtor has to respond to as to
4  whether this is a contingent administrative claims or not,
5  although we have a fairly good idea as to what their
6  administrative claim or their indemnity request would be.  We
7  haven't gone effective yet so the concept of reserving for a
8  cash pool which we haven't achieved yet, is a little premature
9  and the effective date of the plan also triggered the dismissal
10 of the Premiere Creditor's Committee causes of action and in
11 our papers, highlight all the overlap between what was in the
12 estate cause of action and in the individual cause of action.
13 And it would be our firm belief that when the plan went
14 effective, that either the officers in the North Carolina
15 court, or even the Debtor in this court, would say that unless
16 Mr. Angel dismissed out of that complaint all of what was an
17 estate cause of action which was dismissed with prejudice as
18 part of the settlement that Your Honor approved as part of the
19 plan, unless that was taken out of the equation, that we would
20 move in this Court to say that in aid of implementation of the
21 plan, and the retention of jurisdiction that was reserved, that
22 those causes of action should be eliminated.
23      If Your Honor was not prepared to entertain it,
24 clearly those causes of action would then have to be dealt with
25 in North Carolina.  But one of the major things that the

J&J COURT TRANSCRIBERS, INC.

A000148

34

1  claims that you have against them directly? I mean
2  indemnification doesn't really apply. If they'll release --
3  I'll release you from the claim I have against you, but not
4  I'll indemnify you for any claim that I may have against you?
5          MR. STEINBERG: It's -- once you release it, and you
6  violate the release, you're indemnifying from loss. It's a way
7  of picking up attorney fees. It's part of a string, which is
8  part of the release language, all modified by the language of
9  agreements between the IHS Group and the stockholder, which is
10 Mr. Pickett. It's not written to be an indemnity of third
11 party claims. It clearly is not the same language that we had
12 done for Mr. Lord or Mr. Booth, which was a clear intent to
13 establish an administrative expense priority.
14          I think, Your Honor, to put into context what the
15 Debtor -- I think it's important to put into context because
16 there's been a lot of discussion as to what the Debtor achieved
17 or didn't achieve as part of the Premiere Committee settlement
18 and I think the Premiere Committee settlement was significant.
19          At the time that we were faced with trying to wrap
20 up the issues raised by the Premiere Committee, there were two
21 truths that we had to deal. One is that when we go effective,
22 the ability to continue a Section 105 injunction standing by
23 itself, being disrupted by the reorganization process, those
24 arguments have a tendency to not hold up and specifically, the
25 consent on the 105 injunction wasn't until the effective date

35

1  of a plan. So, that lawsuit was going to go forward on the
2  effective date and there was no way to stop it. The second
3  thing, Your Honor, is if I could have convinced you that my
4  plan should embody releases of third party claims, I would have
5  done and I think Your Honor has made it clear in other
6  decisions, and the U.S. Trustee has made it clear, that I
7  couldn't achieve it and I did try to achieve a global
8  resolution and I couldn't get it.
9       But what I tried to achieve was what I could achieve,
10 which is the settlement of estate causes of action. And I knew
11 that if I settled the estate causes of action, I would strip
12 the Angel plaintiffs in North Carolina of everything except for
13 the fraud and the negligent misrepresentation claim. The fraud
14 claim I never had an indemnity obligation for, the negligent
15 misrepresentation claim I had adequate insurance for.
16      That left me to then go to the Creditors Committee
17 and say, look you control the compensation action, which you're
18 bringing on behalf of the estate. I need you to make sure that
19 there's always enough money in the liquidating LLC's so that if
20 this claim ever resurrected itself, and you collected first and
21 you hit the home run and you collected $75 million dollars of
22 insurance, you'd leave some money behind to make sure that
23 these officers were protected. Because that's an estate asset
24 and would be folded into the LLC. It took about two or three
25 times to go through the explanation and the reason to do that,

43

1  see what they think of the claims and the arguments that they
2  raised and I wouldn't be surprised if we have another agreement
3  as to what we think of these claims and maybe they will have
4  some justice in North Carolina, or Your Honor, it may be that I
5  will be filing a motion in this court if I felt it was
6  necessary, to assist them to get rid of those estate causes of
7  action if Mr. Angel is not prepared to amend his complaint
8  because we did bargain for that and that was a substantial
9  benefit of the settlement that we had with them.
10            Your Honor, the remainder of our arguments, and I
11 know I've been talking for a little while, is that we believe
12 that when you strip out the estate causes of action, you're
13 only left with two claims of significance.  The fraud claim
14 which was never insurable and the negligent misrepresentation,
15 which we believe was insurable.  I did say to Mr. Lord that I
16 would make a comment that to the extent that our brief
17 suggested that there was seven out of nine claims which would
18 not be insurable, that I would amend that based on the record
19 today to say it may very well be that there are other claims of
20 that seven that would be insurable and I don't want the papers
21 filed by the Debtor to be construed in any way by the insurance
22 carrier, that they're off the hook on seven of the claims.  It
23 could be that it's more, our argument is that you have a
24 coextensive obligation between insurance and indemnity
25 obligation and what we bought insurance for was for our

**Item #15**

Case 1:04-cv-00917-GMS   Document 11-4   Filed 03/24/2005   Page 17 of 18

compromise was included because the Plan contemplated that the Premiere Committee would have a defined end of existence. Further expenses of counsel acting on behalf the former Premiere Committee were not contemplated, and if levied on the Debtors will inure to the financial detriment of all holders of General Unsecured Claims while benefitting only Class 7 claimants, and thus should not be paid by the Liquidating LLC.

**Equitable Considerations**

8. It cannot be ignored that the Chairman of the former three-person Premiere Committee was Don Angell ("Angell"). He is the largest purported Premiere creditor by far. Counsel for the Premiere Committee used to represent him in these cases. Angell, who is the primary beneficiary of the relief requested in the Premiere Motion, is acting in violation of the Confirmation Order for his purported personal benefit. He continues to assert causes of action in a court in North Carolina that were dismissed by this Bankruptcy Court as part of the Premiere settlement embodied in the Plan. Angell's prosecution of these actions is the genesis of the Pickett, Booth and Lord purported Administrative Expense Claims. Those purported a Administrative Expense Claims could tie up the distribution to the Debtors' ($3 billion) unsecured creditors.

9. It would be highly inequitable to grant relief under the Premiere Motion that would compel a distribution to Angell under these circumstances. The Liquidating LLC intends object to Angell's Claim based on the foregoing and other grounds.