## EXHIBIT A

```
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4   In re                      ) Chapter 11

 5   INTEGRATED HEALTH SERVICES, ) Case No. 00-389(MFW)

 6   INC, et al.,               ) Jointly Administered

 7         Debtors.             ) Ref. Docket No. 11435

 8

 9

10

11

         Video Conference Deposition of DON G. ANGELL

12        (Taken by Counsel for IHS Liquidating LLC)

             Winston-Salem, North Carolina

13                    March 21, 2005

14

15

16

17

18

19

20

21

22

23   Reported by:   Andrea L. Nobrega

24                  Court Reporter

25                  Notary Public
```

2

```
 1   APPEARANCE OF COUNSEL:
 2   By Video Conference for IHS Liquidating LLC:
 3       LESTER KIRSHENBAUM, Esq.
 4       ANA ALFONSO, Esq.
 5       Kaye Scholer LLP
 6       425 Park Avenue
 7       New York, New York  10022
 8       (212) 836-7024
 9       aalfonso@kayescholer.com
10
11   By Video Conference for C. Taylor Pickett and
12   Daniel J. Booth:
13       LEIGHTON AIKEN, Esq.
14       Owens, Clary & Aiken, L.L.P.
15       Suite 1600
16       700 North Pearl Street
17       Dallas, Texas  75201
18       (214) 698-2100
19
20
21
22
23
24
25
```

3

```
 1   APPEARANCE OF COUNSEL: Continued
 2   For Don G. Angell:
 3       JOHN N. TAYLOR, JR., Esq.
 4       BRENT HELMS, Esq.
 5       Robinson & Lawing, L.L.P.
 6       370 Knollwood Street, Suite 600
 7       Winston-Salem, North Carolina  27103-1835
 8       (336) 631-8500
 9       jtaylor@robinson-lawing.com
10
11   By Video Conference for the Official Committee of
12   Unsecured Creditors:
13       JENETTE BARROW-BOSSHART, Esq.
14       Otterbourg, Steindler, Houston & Rosen, P.C.
15       230 Park Avenue
16       New York, New York  10169
17
18   ALSO PRESENT:
19       BRIAN FOLLAS
20       ELLIE T. SCHILLING
21
22   Video Conference deposition of DON G. ANGELL,
     taken by counsel for IHS Liquidating LLC, at the
23   Wingate Inn, 125 South Main Street, Winston-Salem,
     North Carolina, on the 21st day of March, 2005 at
24   1:00 p.m., before Andrea L. Nobrega, Notary Public
     and Court Reporter.
25
```

4

```
 1                   CONTENTS
 2   THE WITNESS: DON G. ANGELL          EXAMINATION
 3       BY MR. KIRSCHENBAUM:               7
 4       BY MR. AIKEN:                     68
 5             INDEX OF EXHIBITS
 6   For IHS Liquidating LLC                Page
 7       1     Order with Respect to Motion
 8             to Don G. Angell ..      6
 9       2     Agreement and Plan of Merger
10             Dated as of 02/27/98 .   11
11       3     Fax from Andrew S. Bogen
12             Dated 03/04/98           11
13       4     Angell Agreement Dated as of
14             03/31/98                 12
15       5     Guaranty of Payment      12
16       6     Officer's Certificate Signed
17             by Elizabeth B. Kelly    12
18       7     Amended Complaint        14
19
20
21
22
23
24
25
```

5

```
 1             PROCEEDINGS
 2       MR. TAYLOR:  Let me go ahead and get some
 3   comments on the record with respect to the order of
 4   Judge Walrath.  This deposition is being taken
 5   pursuant to Judge Walrath's order dated March 2,
 6   2005.
 7       In that order Mr. Don Angell was required
 8   to produce non-privileged documents in his custody
 9   or control that reflect communications between Mr.
10   Angell and Mr. Booth or Mr. Pickett from January 1,
11   1997 through February 2, 2000, also required to
12   produce documents in his custody or control that
13   reflect communications between employees or agents
14   of Mr. Angell and Mr. Booth or Mr. Pickett relating
15   to the Premiere acquisition or pertaining to
16   documents related thereto.
17       Finally, he was requested to produce
18   documents that reflect that Mr. Booth and Mr.
19   Pickett knew of communications between Mr. Angell
20   and any employee or agent of IHS.
21       The order limits the scope of today's
22   examination to the facts and circumstances
23   surrounding the communications between Mr. Angell
24   and Mr. Booth and Mr. Pickett, and also to the
25   substance of the documents that were produced
```

2 (Pages 2 to 5)

6

1 I would request at this time that we just
2 go ahead and mark the order as Exhibit No. 1 to the
3 deposition, and incorporate it into the transcript,
4 and I will hand it to the court reporter.
5 (Exhibit No. 1 marked for identification.)
6 MR. TAYLOR: Then finally, Les, the only
7 other comment I would like to have on the record is
8 I would like to have the record reflect, of course,
9 that this deposition is being taken at a time when
10 the discovery in the North Carolina action has only
11 recently begun, and of course, Mr Angell reserves
12 the right to supplement his testimony to the extent
13 that additional relevant information is developed
14 in discovery in the North Carolina action.
15 With those comments, we are ready to
16 proceed this afternoon.
17 MR. AIKEN: Let me just say something
18 here. Just so it's clear, I understand Mr.
19 Angell's reservation of his rights, but our silence
20 doesn't mean that we agree to such reservation of
21 rights, us meaning the defendants, Pickett and
22 Booth, in the North Carolina action
23 MR. KIRSHENBAUM: Can I ask the court
24 reporter to swear in Mr. Angell
25 Whereupon, DON G. ANGELL, having been first duly

7

1 sworn, was examined and testified as follows:
2 EXAMINATION BY COUNSEL FOR IHS LIQUIDATING LLC
3 BY MR KIRSHENBAUM:
4 Q. Good afternoon, Mr. Angell We
5 appreciate your taking the time to appear for
6 deposition this afternoon, and although I think
7 probably the transcript will or may reflect this in
8 some place, this deposition, of course, is being
9 taken by video conference.
10 I and some of my colleagues are here in
11 the Kaye Scholer offices in New York. Mr Angell
12 and his counsel, Mr. Taylor, are in a conference
13 room in a hotel down in Winston-Salem, as I
14 understand it, and Mr Aiken is presumably in one
15 of his firm's conference rooms in Dallas The
16 court reporter, of course, is present in the room
17 with Mr. Angell
18 Mr Angell, I think, as you know, I am
19 with Kaye Scholer and Kaye Scholer represents the
20 IHS Liquidating LLC, which is the post-plan
21 confirmation entity that's in charge with
22 responsibility for carrying out the terms of the
23 plan of liquidation, the IHS plan of liquidation.
24 We are, as your counsel indicated, taking
25 this deposition pursuant to the order and the order

8

1 has already been marked
2 The order of the court has already been
3 marked as Exhibit No. 1 to the deposition. I will
4 also note for the record that Jenette
5 Barrow-Bosshart, who is a partner at the
6 Otterbourg, Steindler, Houston & Rosen firm, who is
7 counsel for the creditors is also present for
8 today's deposition, along with a couple of my
9 colleagues, and my colleagues are Ana Alfonso and
10 assisting Ms Alfonso and myself -- are you
11 admitted -- Ellie, Ellie Schilling, who is not yet
12 admitted, but she is here as well
13 Mr Angell, have you ever seen the order
14 that's marked as Exhibit No. 1 before today?
15 A Yes, sir.
16 Q And Exhibit No. 1, which is the order,
17 directs that you and certain of the other entities
18 associated with you produce documents that are set
19 forth in the order and specifically they are set
20 forth -- the documents are set forth on pages two
21 and three.
22 Have you seen those particular provisions
23 of the order before?
24 A The documents of page two and three, is
25 that what you are referring to, sir?

9

1 Q Yes, pages two and three of the order
2 contain a list of documents that to the extent they
3 exist are to be produced by you.
4 A Yes, sir
5 Q. I'm asking whether you had occasion --
6 okay. Did you cause a search to be done to look
7 for all such documents?
8 A. Yes
9 Q And did you find any documents that would
10 fall within the categories of documents as set
11 forth on pages two and three?
12 A. Yes
13 Q. And what documents did you find that fall
14 within the scope of the documents set forth on
15 pages two and three?
16 A. Sir, I found a document agreement and
17 plan of merger dated February 27, 1998 among
18 Integrated Healthcare Services, Inc. and Integrated
19 Healthcare Services at Hawthorn Nursing Center and
20 Premiere Associates, Inc and shareholders
21 I also found a news release dated March
22 4, 1998 that was sent to me pertaining to for
23 immediate release from the Integrated Healthcare
24 Services corporate development department in
25 reference to a news release by a Dr. Robert N

3 (Pages 6 to 9)

**10**

1 Elkins, chairman and CEO, but I would like to point
2 out also on this, it did not come from Mr. Elkins.
3 It came from Mrs. Kelly.
4       The Integrated Healthcare Services Corp.
5 director of development is where it was sent to me
6 from. I also found the Angell Agreement dated
7 March 31, 1998 among Integrated Healthcare
8 Services, Inc. and Premiere Associates and the
9 Angell Group, and also the guaranty of payment
10 dated June 25, 1998.
11       The guaranty of payment was signed by
12 executive vice president, Elizabeth L. Kelly. We
13 also have — I found the Integrated Healthcare
14 Services, Inc. officer of certification pursuant to
15 section eight of the Angell Agreement dated March
16 31, 1998, and the amendment to the Integrated
17 Healthcare Services, also signed from the corporate
18 development Mrs. Elizabeth B. Kelly, executive VP
19 of corporate development.
20       MR. KIRSHENBAUM: If you will start, Mr.
21 Taylor, perhaps I could impose upon you to give the
22 court reporter for marking purposes the documents,
23 and I think we might as well mark them in the order
24 that Mr. Angell talked about them.
25       The first item that I believe Mr. Angell

**11**

1 mentioned was the agreement to plan of merger dated
2 February 27, 1998. So I would like that marked as
3 Exhibit No. 2.
4       (Exhibit No. 2 marked for identification.)
5       MR. TAYLOR: Also, for completeness, with
6 respect to Mr. Angell's last answer, also produced
7 was the two deposition transcripts for Mr. Pickett
8 and Mr. Booth.
9       MR. KIRSHENBAUM: Okay.
10       MR. TAYLOR: All right, Exhibit No. 2 is
11 before Mr. Angell.
12       MR. KIRSHENBAUM: And I would like marked
13 as Exhibit No. 3 the document -- I assume that Mr
14 Angell is refering to the multi page document, the
15 first page of which is a tele-copier cover sheet
16 under the letterhead of Blass & Driggs, which
17 contains a press release?
18       MR. TAYLOR: Yes, that's correct with a
19 fax line dated March 4, 1998. I will mark that as
20 Exhibit No. 3.
21       (Exhibit No. 3 marked for identification.)
22       MR. KIRSHENBAUM: I appreciate that.
23       I believe Mr. Angell then referenced a
24 multi-page document entitled Angell Agreement dated
25 March 31, 1998 among Integrated Health Services,

**12**

1 Inc. and Premiere Associates, Inc. and the Angell
2 Group. Perhaps we can have that marked as Exhibit
3 No. 4.
4       MR. TAYLOR: I will mark that as Exhibit
5 No. 4.
6       (Exhibit No. 4 marked for identification.)
7       MR. KIRSHENBAUM: And then Mr. Angell
8 made reference to a guaranty of payment. I believe
9 he is referring to the guaranty of payment — the
10 guaranty agreement dated June 25, 1998, and please
11 let's mark that as Exhibit No. 5.
12       (Exhibit No. 5 marked for Identification.)
13       MR. TAYLOR: The guaranty of payment is
14 marked as Exhibit No. 5.
15       MR. KIRSHENBAUM: Then Mr. Angell noted
16 the Integrated Health Services, Inc., officer's
17 certificate dated June 25, 1998 signed by Elizabeth
18 B. Kelly. Let's mark that as Exhibit No. 6.
19       (Exhibit No. 6 marked for identification.)
20       MR. TAYLOR: All right, the officer's
21 certificate is marked as Exhibit No. 6.
22       MR. KIRSHENBAUM: Then perhaps Mr. Taylor
23 you could clarify something. Mr. Angell made
24 reference to an amendment to an agreement that was
25 also produced. I am not aware that we received at

**13**

1 least as a separate document in the package that
2 you were kind enough to send to us, a separate
3 document labeled amendment to agreement.
4       MR. TAYLOR: When Mr. Angell was
5 speaking, he was reading from the text of the
6 officer's certificate, and you are correct, we did
7 not produce the amendments to the Angell Agreement
8 that are reflected in that document.
9       MR. KIRSHENBAUM: Okay, is there such an
10 agreement or is there such a document, Mr. Taylor,
11 that you are aware of that for whatever reason was
12 not included in the package?
13       MR. TAYLOR: There were some amendments
14 that were entered into with respect to the Angell
15 Agreement, but those documents did not pertain to
16 the request to produce in the subject matter
17 thereof, and therefore, those were not produced.
18       MR. KIRSHENBAUM: Just one other point of
19 clarification, Mr. Taylor, perhaps you would be
20 good enough to just comment on before we actually
21 get into the nuts and bolts of the questioning.
22       Were there any documents that fell within
23 the scope of the order that are privileged,
24 therefore, were withheld?
25       MR. TAYLOR: No, there are not any

4 (Pages 10 to 13)

14

1 documents that were withheld on the basis of
2 attorney/client privilege based upon the review of
3 the documents in Mr. Angell's custody and control.
4      MR KIRSHENBAUM: Okay, I appreciate
5 that. If we could just mark one other document
6 right now, and then I think we will have gotten all
7 the preliminaries out of the way.
8      Could I ask you, Mr. Taylor, to have
9 marked as Exhibit No. 7 the amended complaint.
10      (Exhibit No. 7 marked for identification.)
11      MR. TAYLOR: All right, the amended
12 complaint is marked as Exhibit No. 7.
13      MR KIRSHENBAUM: Thank you.
14      Mr. Angell, could I ask you to take a
15 look at Exhibit No. 2?
16      THE WITNESS: All right, sir.
17      BY MR. KIRSHENBAUM:
18      Q. Exhibit No. 2, again, is a multi-page
19 document entitled agreement to plan of merger,
20 dated as of February 27, 1998 among Integrated
21 Health Services, Inc., Integrated Health Services
22 at Hawthorn Nursing Center, Inc and Premiere
23 Associates, Inc. and its shareholders.
24      A. That's correct.
25      Q. Now, Mr. Angell, were you a party to this

16

1 basically pertaining to us number one we were asked
2 to give up our collateral for a long term note from
3 Integrated Healthcare Services, and we were also
4 being -- it's also stated on page two that Don
5 Angell or Angell Group had a right to convert -- we
6 had an option to purchase 19 5 percent of the
7 capital stock should it be sold and it was in the
8 process of being sold to Integrated Healthcare
9 Services.
10      But the most important thing in here to
11 me, sir, was very basic, that the guaranty of
12 Integrated Healthcare Services was replacing the
13 material guaranty that I had from the former
14 owners
15      I was asked to give it up I was asked to
16 review the document by Mrs. Kelly. Mr. Bernie
17 Fishman is her representative, and Mrs Kelly, and
18 also I had communications with I think Mr Pickett,
19 who was CFO was in Mrs Kelly's position when we
20 first started this, started the negotiations
21      Nd it's a multi-party agreement, this
22 particular document is, but we were working
23 exclusively with Mr Pickett and Mrs Kelly on
24 pertaining to this document, and also I talked with
25 Mr. Booth later on in the negotiations

15

1 agreement?
2      A Yes
3      Q And can you tell me what your interest in
4 this agreement was back in the time that it was
5 executed?
6      A. Sir, my interest in the agreement was as
7 follows. Basically in September 1994 I sold
8 several nursing home leases to the Premiere Group
9 and basically for a long term note of approximately
10 it came out to about 30 years at $100,000 a month.
11      I had given up my collateral -- I was
12 being asked to give up my collateral from Mr Swain
13 who was the president and Mr Herzog who was the
14 chairman of Premiere
15      I was being asked by Integrated to give
16 up my collateral, which was the guaranty. I also
17 had the collateral of the leases. I also had the
18 stock of Premiere Associates, and this document,
19 per se, they had requested and mentioned to us as
20 Don Angell and affiliates included without
21 limitations and the trustee to do this.
22      Also, you will find basically on article
23 6 4 -- let me find that. No, it's I don't know,
24 John, 6.4 is in the Angell Agreement.
25      Basically, sir, what the merger was

17

1      Q. Okay, let's just stick with this document
2 which we marked as Exhibit No. 2, and we'll give
3 you an opportunity to talk about each of the
4 documents that you produced.
5      Did you or any of the entities that were
6 affiliated with you execute Exhibit No. 2 in any
7 place?
8      A. No.
9      Q. Were you at all consulted by Mr. Swain in
10 connection with this exhibit?
11      A. Yes.
12      Q. Tell me everything you can recall about
13 your conversations with Mr. Swain with respect to
14 Exhibit No 2?
15      A. Sir, Mr. Swain was my CFO when I sold the
16 buildings to them in 1994. The way Mr Swain
17 explained it to me, he said, Don, basically what
18 they request of you is this, is to give up your
19 collateral Mr. Swain and Mr. Herzog would be
20 removed as collateral.
21      Integrated Healthcare Services could not
22 give me a lien on the building until our lien on
23 the leases -- in other words, I could not get a
24 collateral lien on those. I could not have their
25 stock because the stock was going to be owned by

5 (Pages 14 to 17)

18

1 Integrated and it had to be unencumbered, and that
2 Mrs. Kelly, Mr. Pickett and Mr Booth would be the
3 officers of Premiere going forward
4       MR. KIRSHENBAUM: I would like the court
5 reporter to please read back the last question.
6       (The record was read.)
7       THE WITNESS: I told you
8       BY MR. KIRSHENBAUM:
9 Q   That's it?
10 A   See, I was one of five parties to this
11 agreement. I was not required to sign. It was
12 just an outline in the agreement what I was to do.
13 Q   Okay, now, the — who executed this
14 agreement on behalf of Premiere Associates, if you
15 can recall?
16 A   Mr. Swain I'm sure did. I don't have it
17 before me or parties to it  After we started Mr.
18 Swain did sign it, sir  Ms. Jewel Austin who was a
19 minority owner signed it, sir, A-u-s-t-i-n, Mr
20 Brewster Bell, B-e-I-I, Jr. signed it as a minority
21 owner, and Mrs. Rebecca Muenchow, M-u-e-n-c-h-o-w
22 and Mr. Troy Curry, C-u-r-r-y, signed it as
23 minority shareholders.
24 Q   Do you know each of those people?
25 A   They used to work for me. Yes, sir, I

19

1 knew them well.
2 Q   And did you have any conversations with
3 any of the minority shareholders in connection with
4 this agreement?
5 A   Only Mr Swain
6 Q   Now Mr Swain was considered to be a —
7 was a majority shareholder, correct?
8 A   Mr. Swain —
9 Q   Or principal shareholder I should say.
10 A   Mr. Swain and Mr. Herzog is my
11 understanding were the controlling shareholders
12 Q   I see on this document that Mr. Herzog
13 also signed the agreement as president of Premiere?
14 A   I assume that's correct. I don't have
15 that.
16 Q   I would like to ask you to turn to page
17 68 of Exhibit No. 2.
18 A   68 — hold on, sir. How about 69? Mrs.
19 Kelly signed it on 69. Mr Herzog did not sign
20 Exhibit No 8.
21       MR TAYLOR: There are multiple page 68s.
22       BY MR. KIRSHENBAUM:
23 Q   If I could ask you to turn —
24 A   There are five 68s, sir.
25 Q   Do you see one with Mr. Herzog's

20

1 signature on it?
2 A   Give us time to get there.
3 Q   Take all the time you need.
4 A   He did sign it as president, that's
5 correct.
6 Q   Do you recognize his signature?
7 A   I assume it's his signature  I didn't
8 see him sign it.
9 Q   Did he use to work for you as well?
10 A   Yes, sir
11 Q   And Mr. Herzog was president of Premiere
12 at the time that this agreement with IHS was
13 signed?
14 A   Apparently so, yes.
15 Q   Well, did you have any conversations with
16 Mr. Herzog about this?
17 A   Most of my conversation -- see, Mr.
18 Herzog was based in Florida. I didn't see Mr.
19 Herzog that often. I dealt primarily with Mr.
20 Swain.
21 Q   Mr. Swain was based in North Carolina?
22 A   In Clemmons, North Carolina, yes, sir
23 Q   Now, you are one of the plaintiffs in the
24 litigation that's now pending in the federal
25 district court in North Carolina, correct?

21

1 A   That's correct.
2 Q   And there are two other entities that are
3 affiliated with you that are also plaintiffs in the
4 litigation, is that correct?
5 A   Name them, please.
6 Q   The complaint lists Don Angell
7 Irrevocable Trust under instrument dated July 24,
8 1992. Are you familiar with that entity?
9 A   Yes, sir.
10 Q   And the complaint also lists the Angell
11 Care, Inc  Are you familiar with that entity?
12 A   Yes, sir.
13 Q   Now, when you were having discussions
14 with Mr. Swain concerning the Angell Agreement that
15 we marked — I'm sorry, concerning the agreement to
16 the plan of merger that we marked as Exhibit No. 2,
17 were you dealing with Mr Swain as just on your own
18 individual behalf or also as a representative of
19 the Don Angell Irrevocable Trust and on behalf of
20 Angell Care, Inc.?
21 A   I was dealing on all of them.
22 Q   On behalf of all of them?
23 A   On the entire group.
24 Q   I notice in the complaint that D Gray
25 Angell, Jr and Don R. House are listed as

6 (Pages 18 to 21)

22

1  co-trustees of the Don Angell Irrevocable Trust, is
2  that correct?
3      A    That's correct.
4      Q.   Did either of those individuals have, to
5  your knowledge, any communications with Mr. Swain
6  concerning Exhibit No. 2?
7      A.   Not to my knowledge.
8      Q.   And in fact, from your perspective, you
9  were the representative of dealing with Mr. Swain
10 and with the other shareholders and offices of
11 Premiere Associates on behalf of the entire group,
12 is that correct?
13     A.   I would say that is correct, because I
14 was the shareholder of – these other entities were
15 shareholders of Angell, of the properties when they
16 were in Angell Care prior to their sale of Premiere
17 Associates.
18          I had it set up in a trust  Mr. House
19 and D Gray Angell, Jr , they are trustees of the
20 trust, and I was a spokesman  The trust really
21 doesn't come into play until my death.
22     Q.   And how about Angell Care, Inc.?
23     A.   That's a defunct company that when we
24 sold these buildings we closed that down.
25     Q.   So when you say when you sold the

23

1  buildings, you are talking about back in the time
2  period --
3      A.   Wait just a minute.  Angell Care is still
4  a viable corporation.  It's just not active.
5      Q.   I understand that  What I'm trying to
6  clarify is you shut it down as an active
7  corporation around 1994?
8      A    That's correct.
9      Q.   So at the time of the agreement and plan
10 of merger, which has been marked as Exhibit No, 2,
11 and the time frame we are referring to is February
12 and March of 1998, Angell Care, Inc. had no
13 employees or agents other than yourself?
14     A.   No, I would say there were still some
15 employees in it.  It takes a long time to finish up
16 cost reports and things of this nature.  In fact,
17 some of them probably still aren't complete.
18     Q    And but none of the employees that
19 remained with Angell Care, Inc  as of 1998 were
20 involved at all in the transaction that's reflected
21 in Exhibit No. 2 and Exhibit No. 4 and Exhibit No.
22 5, is that correct?
23     A.   Well, I can only speak for two  You are
24 jumping ahead of yourself, sir.  I am going to only
25 speak for two at this time  I'm sure there were --

24

1      Q.   Okay
2      A.   Let's me finish  I'm sure there were
3  employees that went from Angell Care over to
4  Premiere, and I'm sure they worked on both sides of
5  the transaction in order to bring it together and
6  get it all brought together on a new company
7          MR. KIRSHENBAUM:  Can the court reporter
8  please read back the last answer
9          (The record was read )
10         BY MR KIRSHENBAUM:
11     Q    Let's focus on Exhibit No. 2.  I'm not
12 sure I understand that answer
13     A    If you want me to answer two, let me
14 know.  Don't jump over.
15     Q    Mr. Angell, please listen to the
16 question  With respect to Exhibit No. 2, other
17 than yourself, was any individual involved on
18 behalf of either Don Angell individually or on
19 behalf of the Don Angell Irrevocable Trust, or on
20 behalf of Angell Care, Inc.?
21     A.   No.
22     Q    Now, in connection with your
23 communications involving Exhibit No. 2, did you at
24 any time write any letters to anyone?
25     A.   Such as?

25

1      Q.   Anything.
2      A.   Why would I — I have no reason to write
3  letters on this one because it's just an outline of
4  a deal.  No.
5      Q.   Did you receive any letters from anyone
6  with respect to Exhibit No. 2?
7      A.   Yes, I did  I received a press release
8  from Mrs. Kelly on March the 4, 1998 stating how
9  great Integrated was, the earnings and this type
10 thing, and Exhibit No. 3, if you will look at the
11 top of Exhibit No  3, you can see that Mrs  Kelly
12 sent it directly to me from Integrated Healthcare
13 Corp -- Integrated Healthcare Services Corp,
14 corporate development and I did receive that on
15 March 4th, dated March 4th, sir
16     Q.   And that was in connection with Exhibit
17 No  2?
18     A.   Well, that was in relationship  See, we
19 had Exhibit No. 2 and it was a carryover.  They
20 knew we were a party to Exhibit No  2, sir.
21     Q    You are not a party to Exhibit No. 2, are
22 you?
23     A.   My name is in there
24     Q.   Are you a party to Exhibit No. 2?
25         MR. TAYLOR:  Objection.

7 (Pages 22 to 25)

26

1     THE WITNESS: I had referred to Don G.
2  Angell in Exhibit No. 2, even though I didn't sign
3  it. The reference is made to my name in several
4  places, sir.
5     BY MR. KIRSHENBAUM:
6  Q. But you did not sign it, correct?
7  A  I did not sign it. I had no reason to.
8  Q. And you were not asked to sign Exhibit
9  No. 2, is that correct?
10  A. No, that's correct. But I did receive
11  Exhibit No. 3, if you ask for any information, from
12  the corporate development. Mrs. Kelly informed me
13  as to the status of Integrated Healthcare Services
14  Q. Okay, now other than Exhibit No. 3, did
15  you receive any other written communication that
16  relates to the document entitled agreement and plan
17  of merger dated as of February 27, 1998 among
18  Integrated Health Services, Inc., Integrated Health
19  Services at Hawthorn Nursing Center, Inc. and
20  Premiere Associates, Inc. and its shareholders?
21     MR. TAYLOR: Note my objection.
22     THE WITNESS: To my knowledge, I didn't
23  receive any written, but I received a personal
24  visit from Mr. Bernie Fishman
25     BY MR. KIRSHENBAUM:

27

1  Q. We'll get to that in a minute.
2  A  Well, you asked me. I'm telling you.
3  Q. And you don't have any other writings
4  that you received, correct?
5     MR TAYLOR: Objection. Go ahead
6     THE WITNESS: What was your question?
7     MR. KIRSHENBAUM: Read it back
8        (The record was read.)
9     THE WITNESS: I had a personal visit,
10  that's correct, pertaining to Exhibit No. 2.
11     BY MR. KIRSHENBAUM:
12  Q  Again, Mr. Angell, I just want the record
13  to be clear --
14  A. I do not have any other writings  I did
15  have a personal visit and a telephone call from
16  Mrs Kelly.
17  Q. Now, who was Mr. Fishman?
18  A. Mr. Fishman was in charge of
19  acquisitions  He was a field auditor for
20  acquisitions for Integrated Healthcare's corporate
21  development. He answered to directly -- he worked
22  for Mr. Pickett for several years and when Mrs.
23  Kelly replaced Mr Pickett, he was an employee who
24  answered directly to Mr. Pickett -- I mean, excuse
25  me, Mrs. Kelly.

28

1     He was also very close to Mr. Booth and
2  he said Mr. Booth would have to plan any financial
3  strategy that we had. He came to my office in
4  Clemmons, North Carolina
5  Q. When did Bernie Fishman come to your
6  office?
7  A. Sir, what was the question?
8     MR. KIRSHENBAUM: Please read back the
9  question.
10     (The record was read )
11     THE WITNESS: I can't give you an exact
12  date on that. It was sometime after the Exhibit
13  No. 2 was finalized or in the process. I don't
14  even know if it was finalized or not.
15     BY MR. KIRSHENBAUM:
16  Q. So you don't recall whether your visit
17  from Mr. Fishman was before February 27, 1998 or
18  after February 27, 1998, is that correct?
19  A. I would assume it was after. I'm not
20  sure about that.
21  Q. What's the basis of your assumption that
22  it was after February 27, 1998?
23  A  Well, you know, let me withdraw that.
24  I'm not sure when it was, but he came to my office
25  to tell me what Integrated Healthcare Services had

29

1  to offer and how great it would be. He was in the
2  process of trying to get me to convert my note to
3  stock at some point in the future and he was
4  ambassador for Mrs. Kelly
5  Q. And the meeting with Mr. Fishman was at
6  your office?
7  A. That's correct, sir.
8  Q. And how many times did you meet with Mr.
9  Fishman?
10  A. One.
11  Q. How long was the meeting?
12  A. I don't know, 30, 45 minutes
13  Q. And who else participated besides
14  yourself and Mr Fishman?
15  A. He had met earlier in the day with Mr.
16  Swain and he met with me alone
17  Q. So at the meeting that you had with Mr.
18  Fishman, it was just the two of you?
19  A. That's correct.
20  Q. And did you have any other communication
21  with Mr. Fishman subsequent to that meeting in your
22  office?
23  A. We talked on the telephone several times.
24  I can't give you the dates and times, but we talked
25  on the telephone several times  In fact, during a

8 (Pages 26 to 29)

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

30

1 period Mr. Fishman was -- it was very important to
2 him to get the deal to go down, and I had the key
3 to the deal.
4        Unless I approved it, it couldn't be
5 done. Ernie -- Bernie communicated by phone I
6 would say several different occasions and so did
7 Mrs. Kelly about the deal, because had I agreed to
8 the assignment to give up my stock, to give up all
9 the signatures of the principals, the two
10 principals, to give up my leases, I had to do that
11 before the deal could go down, sir.
12        Q.   Now, you had one face to face meeting
13 with Mr. Fishman, correct?
14        A.   I told you that six times.
15        Q.   Did you ever have a face to face meeting
16 with Elizabeth Kelly?
17        A.   Yes.
18        Q.   When and where?
19        A.   It was in Owings Mill, Maryland, with Mr.
20 Fishman and Mr. Booth.
21        Q.   When was that?
22        A.   It was sometime after the document was
23 signed.
24        Q.   Which document?
25        A.   Exhibit No. 2.

31

1        Q.   Was it after Exhibit No. 4 -- please take
2 a look at Exhibit No. 4.
3        A.   I don't think it was after Exhibit No. 4
4 because I met with them about the deal and it's
5 basically how the structure would be, and Exhibit
6 No. 4 was not until March the 31st. So probably it
7 was in the month of March that I met with him. It
8 was Mr. Booth, Mrs. Kelly, Mr. Fishman.
9        Mrs. Kelly was also wanting me -- she
10 knew this was going down and she also indicated
11 that the growth pattern for Integrated Health
12 Services going forward would be management
13 contracts only.
14        She said that management contracts, it
15 was in the direction of where they wanted to agree
16 Now, they could be qualified management contracts
17 which I understand they did in California or they
18 could be regular management contracts for on a fee
19 basis and she outlined the program, what her
20 desires were and how it would work.
21        We were talking about probably other
22 properties that I didn't own, but possibly could
23 buy and let them manage, but a straight out lease
24 they would have had -- they had to capitalize the
25 leases and they wanted to do a qualified

32

1 management, what looks like a lease, smells like a
2 lease, but it's not a lease.
3        Q.   You are talking about a meeting you had
4 in Owings Mill, Maryland with Mr Fishman you said
5 and Mrs Kelly and Mr. Pickett?
6        MR. TAYLOR:  Objection
7        THE WITNESS:  Mr Booth  I did not
8 mention Mr. Pickett.
9        BY MR  KIRSHENBAUM:
10        Q.   Mr. Booth, okay  Was anyone else present
11 at that meeting?
12        A.   I think Mr  Pickett stuck his head in the
13 door and said hello, but that's about it.
14        Q.   And how long would you estimate that
15 meeting lasted?
16        A.   I was up there an hour or so.
17        Q.   And any other meetings that you had with
18 Mrs. Kelly or Mr. Fishman or Mr. Booth?
19        A.   I met with Mr. Booth a couple times, one
20 at a national association meeting and, two, he was
21 the man that really and truly put the financial
22 structure together, and as to how it would be done.
23        After the deal had gone down, I met with
24 him on two different occasions about possibly
25 trading my note for properties they owned in North

33

1 Carolina that were unencumbered.
2        But little did I know that the bank had a
3 deed of trust on them.  It had never been disclosed
4 to me that my buildings had been pledged to
5 Citicorp, and I still didn't know it until they
6 defaulted on my payment.
7        Q.   Let's try to be a little more specific
8 here.  The document which is entitled Angell
9 Agreement is dated March 31, 1998?
10        A.   That's correct.
11        Q.   You testified earlier about one meeting
12 that you were in with Mrs. Kelly and Mr. Fishman
13 and Mr. Booth that lasted about 45 minutes to one
14 hour that may or may not have been prior to March
15 31, 1998.
16        MR. TAYLOR:  Object to form.
17        BY MR  KIRSHENBAUM:
18        Q.   Do you recall any other meetings that you
19 had with any of those individuals prior to March
20 31, 1998?
21        A.   Not to my knowledge.
22        Q.   You referred earlier to meeting Mr. Booth
23 at some association meeting, do you recall that?
24        A.   Yes, sir
25        Q   Was that after March 31, 1998?

9 (Pages 30 to 33)

34

```
 1      A.  I can't tell you truthfully when that
 2   meeting was.  It was in the spring of '98, though.
 3      Q.  How long did you meet with Mr. Booth at
 4   that time?
 5      A.  You know, you got better questions to ask
 6   than this.  I mean, how much time -- I could have
 7   met him in the rest room -- I could have met him at
 8   a cup of coffee.  You are wasting our time and
 9   their time.
10      Q.  Did you meet him in the rest room or at a
11   cup of coffee?
12      A.  I don't remember where I met him   I met
13   him, though.
14      Q.  Please turn to Exhibit No. 4.
15      A.  Okay.
16      Q.  Who negotiated Exhibit No. 4 on behalf of
17   yourself personally and on behalf of the Angell
18   Family Limited Partnership and the Don G. Angell
19   Irrevocable Trust?
20          MR. TAYLOR:  Objection.
21          THE WITNESS:  I did, sir
22      BY MR. KIRSHENBAUM:
23      Q.  Is D. Gray Angell, Jr  your son?
24      A.  Yes, sir
25      Q.  Was he involved in negotiating the terms
```

35

```
 1   of this agreement?
 2      A.  No, sir.
 3      Q.  No involvement whatsoever?
 4      A.  No.  I talked to him about it, but as far
 5   as negotiation, no.
 6      Q.  And Don R. House is the other trustee on
 7   the trust?
 8      A.  That's correct.
 9      Q.  Was he involved at all in negotiating the
10   terms of this agreement?
11      A.  As an attorney he was probably, but not
12   as a trustee.
13      Q.  Was Don R. House the counsel that you
14   used in connection with negotiating the agreement
15   that's been marked as Exhibit No. 4?
16          MR. TAYLOR:  Objection to form.
17          THE WITNESS:  He reviewed it, yes, sir,
18   he did.
19      BY MR. KIRSHENBAUM:
20      Q.  Is Mr. House an attorney who practices by
21   himself or is he with a firm?
22      A   He is with a firm.
23      Q.  What's the name of his firm?
24      A.  House & Ingersoll.
25      Q.  Anyone else at that firm involved in
```

36

```
 1   looking at this agreement on your behalf or
 2   negotiating this agreement on your behalf?
 3          MR. TAYLOR:  Objection
 4          THE WITNESS:  No, sir.
 5          BY MR. KIRSHENBAUM:
 6      Q.  Did you have any accountings or any
 7   financial consultants involved when you were
 8   negotiating the agreement?
 9      A.  No.  I did, I'm sure, in my office have
10   some accountants look at it, but you know, this is
11   the representatives and warranties of the buyer and
12   that was the main thing, sir, that particularly
13   section six, number four, if you will see the SEC
14   documents in this, that was very important to me.
15          I have just enough knowledge of a 10K
16   report  I haven't been involved in it and this
17   told me the financial status of the company as of
18   1996, and it was something that I felt was very
19   important and I felt very comfortable with at that
20   time.
21          Then also on 6.5 there were conflicting
22   agreements.  What 6 5 told me basically that there
23   would be nothing else that would come before my
24   note of conflicting agreements or anything of that
25   nature, and then if you go on to 6.6, 6 7 rather,
```

37

```
 1   the material changes.
 2          I went in -- in other words, when you
 3   look at this, this is telling you a seller that
 4   you have a company with integrity and with honesty
 5   and with everything else, but in the meantime, sir,
 6   while these documents were being done, Dan Booth
 7   and Integrated Healthcare Services went out and
 8   borrowed 2.1 billion dollars knowing they were
 9   going to have to pledge my assets
10          They also, in his deposition, Mr. Pickett
11   made the statement that it took a hit on home
12   healthcare for $205,000,000, sir, and while they
13   had all this taking place -- and they signed this
14   document.  They agreed to this Angell Agreement,
15   sir, and they lied to me.
16          They knew they were doing something
17   wrong.  How can anyone sign an agreement like this
18   and go out there, and I'm not going to call it
19   fraud because I'm not smart enough, but I got
20   screwed, better known in North Carolina the F word.
21      Q.  Now, other than yourself, who was
22   involved -- and Mr House, who was involved on your
23   behalf in negotiating the agreement that we marked
24   as Exhibit No. 4?
25      A   I just got through telling you, I did it.
```

10 (Pages 34 to 37)

**38**

1  I just went through
2     Q.  By yourself?
3     A.  Mr. House and I -- Mr. House reviewed it,
4  but I am intelligent enough to believe that a
5  material change doesn't take an attorney and they
6  did it on me.
7     Q.  Who did you negotiate the agreement with?
8     A.  Excuse me?
9     Q.  Who did you speak to on the other side of
10  the table in negotiating the agreement that we
11  marked --
12     A.  Mrs. Kelly and Mr. --
13         MR. TAYLOR:  I'm not sure he was finished
14  with his answer.
15         THE WITNESS:  Mrs. Kelly and her
16  representative, Mr. Fishman.
17         BY MR. KIRSHENBAUM:
18     Q.  You mean Mrs. Kelly?
19     A.  It's what it is.  She signed it, sir.
20  Right there it is.
21     Q.  Other than Ms. Kelly, who did you
22  negotiate the agreement with?
23     A.  Mr. Fishman, but in the meantime, sir,
24  Mr. Booth went out and borrowed 2.1 billion dollars
25  knowing he was going to have to sign my assets.

**39**

1     Q.  Okay, Mr. Angell, did your negotiations
2  with Ms. Kelly and Mr. Fishman take place in a room
3  or on the table or over the telephone?
4     A.  It doesn't matter where it was.  They
5  gave me these documents.
6     Q.  Please answer the question.
7     A.  I'm answering your question.  It could
8  have been any place.  It could have been any place.
9  Why don't you ask her.  She signed the damn
10  documents.
11     Q.  I'm asking you because you are the one
12  that's the plaintiff in the litigation, not Ms.
13  Kelly?
14     A.  You better believe I'm the plaintiff, and
15  I am happy to be, because they screwed me.
16     Q.  Where did those negotiations take place,
17  in a room or over the telephone?
18     A.  Both.
19     Q.  You had face to face meetings with Ms.
20  Kelly?
21     A.  I did when I was up there.  I told you
22  about that.
23     Q.  When were you up there?
24     A.  I told you probably in the month of
25  March.

**40**

1     Q.  And you had negotiations with Ms. Kelly
2  about this agreement?
3     A.  I had  Ms. Kelly and I talked several
4  times on the telephone and there about this
5  agreement.  It was the Angell Agreement.  It was
6  brought out from the Integrated agreement and, sir,
7  it's the merit of the integrity of a company that
8  would give these types of covenants in an exhibit
9  knowing damn well that they going to change the
10  mind they are going in and pledge my assets.  I
11  don't care who I talked to.
12     Q.  Well, but I do.
13     A.  It's a fucking joke.
14     Q.  I'm the one asking the questions.  I need
15  to know who you spoke to and when --
16     A.  I told you four times, I talked to Ms.
17  Kelly, Mr. Fishman while Mr. Booth and Mr. Pickett
18  were out selling the home healthcare and taking a
19  write-off of $205,000,000 no one told me about.  I
20  would not have signed it.
21         If I had known that or I wouldn't have
22  signed -- if I had known it was a 2.1 billion
23  dollar loan being used, I wouldn't have signed it.
24  There wouldn't be any negotiations if they had been
25  honest with me.

**41**

1     Q.  Did you review before you signed this
2  document -- before you executed this document, did
3  you review the 1996 10K?
4     A.  Yes
5     Q.  And did you review the proxy statement in
6  connection with the annual meeting held on June 20,
7  1997?
8     A.  Is that the one -- is that the one where
9  you had the purchase of Rotech and Horizon
10  Healthcare.
11     Q.  I'm reading from 6.4 --
12     A.  I'm asking the question.  Is that the one
13  that had Rotech on it, sir?
14     Q.  Did you review the proxy statement issued
15  in connection with the annual meeting held on June
16  20, 1997?
17         MR. TAYLOR:  If you recall.  You can
18  answer his question if you recall.
19         THE WITNESS:  I don't recall.  I know I
20  read the one that had the Rotech on it, sir.
21         MR. TAYLOR:  Go ahead and ask the
22  question.
23         BY MR. KIRSHENBAUM:
24     Q.  Did you review the financial statements
25  that were contained in the 1996 10K?

11 (Pages 38 to 41)

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

42

1    MR. TAYLOR: Object to the form. Go
2  ahead and answer if you recall or have knowledge to
3  answer the question.
4    THE WITNESS: The financial statement I
5  reviewed was sent to me on March 4th, sir, and a
6  press release by Mrs. Kelly from the development
7  department. You will find that attached to that
8  press release. I reviewed those financials, sir.
9    BY MR. KIRSHENBAUM:
10   Q.   And the financial statements that are
11  attached to Exhibit No. 3, which is the --
12   A.   I think it's Exhibit No. 2, sir.
13   Q.   Exhibit No. 2. It's Exhibit No. 3,
14  actually, contains?
15   A.   Where is the press release?
16   Q.   Let me ask the questions and I'm going to
17  try to let you answer them, okay?
18   A.   Three, you are right, sir, I'm sorry.
19   Q.   All right. So Exhibit No. 3 contains the
20  numbers for the quarter ended December 31, 1997?
21   A.   I believe that's correct, sir.
22   Q.   And you reviewed those numbers and you
23  also reviewed the numbers that are contained for
24  the 12 months ended December 31, 1997, correct?
25   A.   12 months ending, that's correct.

43

1    Q.   Now, was Mr. Booth personally involved in
2  any discussions with you concerning the agreement
3  that we marked as Exhibit No. 4, which is entitled
4  Angell Agreement dated as of March 31, 1998?
5    MR. TAYLOR: Note my objection. Go
6  ahead.
7    THE WITNESS: The document is signed by
8  Mrs. Kelly that Mr. Booth -- if you will go to the
9  back, sir -- go to the back of this exhibit -- you
10  will find the schedule of payment on my note. The
11  interest you got really and truly you see that,
12  sir? Do you see the schedule of payment?
13   BY MR. KIRSHENBAUM:
14   Q.   Would you try to be more specific in
15  terms of the specific page you are referring to?
16   A.   It would be the addendum of page two
17  through --
18   MR. TAYLOR: It's Exhibit A to the
19  agreement.
20   THE WITNESS: Exhibit A to the agreement,
21  yeah.
22   BY MR. KIRSHENBAUM:
23   Q.   It's entitled Angell Agreement, Exhibit
24  A, and at the bottom in handwriting it says page
25  one of 24?

44

1    A.   Mr. Booth and I put that together, yes,
2  sir.
3    Q.   Excuse me --
4    A.   I'm answering your question. That was my
5  contact with Mr. Booth. Mr. Booth put this
6  together for me. I talked with him about it.
7    Q.   When did you talk with him?
8    A.   Well, when the document was sent out.
9  Whenever I got it -- it was dated March 31st. No
10  one else in the company had authority to do this
11  other than Mr. Booth. He said he had to do it for
12  cash flow purposes.
13   Q.   Mr. Angell, this agreement, which is
14  Exhibit No. 4, is dated March 31, 1998, and it is
15  indicated here that it was signed on that date by
16  yourself and by certain other people on your behalf
17  and as you indicated by an Elizabeth Kelly, and I'm
18  asking you very precisely whether you had any
19  communications with Mr. Booth about this agreement,
20  and whether you had any negotiations with Mr. Booth
21  about this agreement before you executed it?
22   MR. TAYLOR: Objection, asked and
23  answered. Don, go ahead and answer.
24   THE WITNESS: Yes, I did about this
25  payment schedule. I wanted to know how it was

45

1  coming down and Mr. Booth was the man. It's an
2  attachment.
3    BY MR. KIRSHENBAUM:
4    Q.   Whose payment schedule is this?
5    A.   This was Premiere Associates payment
6  schedule of which Mr. Booth was an officer, sir, or
7  soon to be an officer.
8    Q.   He became an officer of Premiere when?
9    A.   At the closing date in June, soon to be
10  an officer in this company. He was the chief --
11   Q.   Look at the first page of this agreement.
12   A.   It's got Premiere Associates on it. He
13  took this from the payment schedule that Premiere
14  had and he approved it and said this is what we'll
15  continue to do, Don.
16   Q.   When did he say that to you?
17   A.   He said it -- I don't know whether it's
18  even relevant. He said he said it. It's there.
19  He said it in March, I'm sure. It was in March
20  before I signed the damn thing.
21   Q.   Do you recall specifically that Mr. Booth
22  sent to you before you signed this agreement,
23  that's labeled as Exhibit No. 4, that Premiere
24  would continue to make the payments to you?
25   A.   Yes, sir.

12 (Pages 42 to 45)

46

1    MR. TAYLOR: Les, we have been going
2  about an hour. I would like to take a break at a
3  convenient place when we get there.
4    MR. KIRSHENBAUM: Let's stop right now.
5  Let's take five minutes and continue.
6    (Off-the-record, brief recess.)
7    MR. KIRSHENBAUM: Can I ask the court
8  reporter to read back the last question and answer.
9    (The record was read.)
10   BY MR. KIRSHENBAUM:
11   Q. Let's turn to Angell Agreement Exhibit A
12 that you have been referring to, Mr. Angell. On
13 the bottom of the first page of Exhibit A, there is
14 a handwritten note that says page one of 24 and
15 then each page underneath that is consecutively
16 numbered again by hand through page 24. Who
17 numbered these pages, do you know?
18   A. I do not know, sir. I am assuming it
19 came from Mr. Booth because we negotiated it, sir.
20   Q. You didn't negotiate this with Mr. Booth?
21   MR. TAYLOR: Object to the form
22   THE WITNESS: Sir, I would be glad to
23 answer. We had to negotiate, sir, the payment
24 schedule. Mr. Booth approved this payment
25 schedule. Now, there is an FS at the bottom. I'm

47

1  not sure who that is.
2    BY MR. KIRSHENBAUM:
3    Q. Now, the second page of this exhibit says
4  Premiere Associates, Inc reconciliation of notes
5  evidencing purchase price as of September 28, 1994
6  Do you see that?
7    A. Yes, sir.
8    Q. Did you receive this schedule back in
9  September 28, 1994 when you sold your business to
10 Premiere Associates?
11   A. Yes, sir.
12   Q. So this is a schedule that you had for
13 almost four years before the Premiere business was
14 merged into IHS?
15   A. That's correct, sir.
16   Q. So this is not a schedule that was
17 prepared in connection with the Premiere merger to
18 IHS?
19   MR. TAYLOR: Objection
20   THE WITNESS: Sir, it was given part
21 of -- as you can see it's Exhibit A of the
22 document. It was part of the Angell Agreement,
23 sir.
24   BY MR. KIRSHENBAUM:
25   Q. But you had this Exhibit A going back to

48

1  September 1994?
2    A. But, sir, anyone agrees to assume a debt
3  like this needs to be able to approve the payment
4  schedule and this is what Mr Booth did
5    Q. Now, on the second page of the document,
6  in the middle of the page there is a box with a
7  certain line and it says to George Hollodick and
8  then underneath that co, and it says Don House and
9  then on the right it says from Dave Hutchins. Who
10 is Hollodick?
11   A. He is an attorney with Blanco,
12 Tackaberry, Collins & Metamoris
13   Q. What involvement did that firm have in
14 connection with the merger between Premiere and
15 IHS?
16   A. They represented Premiere, Mr. Hollodick
17 did.
18   Q. And Mr. House represented you, correct?
19   A. That's correct
20   Q. And this was sent to those two
21 individuals by Dave Hutchins, do you see that?
22   A. I'm not sure that's to Dave, sir. It's
23 not Dave.
24   Q. Do you know the name of the individual?
25   Q. Do you recognize the name of the individual who

49

1  sent this fax?
2    A. I would say it was probably Faye Hutchins
3  instead of Dan Hutchins
4    Q. And who is Faye Hutchins?
5    A. She was an administrative assistant to
6  Mr. Swain.
7    Q. At Premiere Associates?
8    A. That's correct
9    Q. So Premiere Associates sent this document
10 directly to their own attorney and to your
11 attorney?
12   A. That's correct, sir, and it was also sent
13 to Mr. Booth, sir.
14   Q. How do you know that?
15   A. Because I talked to Dan at length about
16 this. We had discussions. He had it in his hands,
17 sir. He agreed to this. Someone -- these two
18 individuals did not represent Integrated Healthcare
19 Services, sir. Someone in Integrated had to
20 approve this payment schedule and it was in Mr.
21 Booth's --
22   Q. How do you know that?
23   A. Well, Mr. Booth had to. He was the
24 controller, chief financial officer of Premiere
25 He had to approve the payment

13 (Pages 46 to 49)

50

1    Q.  Was he the officer, CFO of Premiere back
2  on March 2, 1998 when this was faxed, this document
3  was faxed?
4    A.  He was soon to be and any time a
5  financial officer -- if he has to approve what he
6  was going to pay, he was assumed to be a financial
7  officer.
8    Q.  So you are assuming --
9    A.  I'm not assuming. I know he became a
10  financial officer.
11    Q.  I'm not asking are you whether he became
12  a financial officer. I'm asking whether you are
13  assuming that he specifically approved the payment
14  schedule?
15    A.  I'm not assuming anything. He approved
16  it.
17    Q.  How do you know that?
18    A.  He told me he approved it.
19    Q.  When did he tell you that he approved it?
20    A.  He told me prior to closing he approved
21  this.
22    Q.  Where was he when he told you that?
23  Where were you?
24    A.  Excuse me?
25    Q.  Where were the two of you when he told

51

1  you specifically that he was approving the payment
2  schedule?
3    A.  I think this was by phone, sir.
4    Q.  And who initiated the phone call?
5    A.  He did
6    Q.  Why did he call you?
7    A.  Because he owed me roughly $15,000,000,
8  sir. He was going to soon.
9    Q.  And therefore, he called you?
10    A.  Sure. He had the courtesy to call me
11  knowing that they were going to be liable for this.
12  He had to go --
13    Q.  So he just picked up the phone to call
14  you to say I agree to this payment schedule?
15    A.  I'm not going to answer anything that's
16  as stupid as that, John, I'm sorry. I mean, I told
17  the man He picked up the phone or he called me in
18  the conversation, said, Don, I approve this. This
19  is fine. We can assume this.
20    Q.  And what else did he say to you in that
21  conversation?
22    A.  I don't know.
23    Q.  You recall that he specifically told you
24  that he approves the payment schedule, correct?
25    A.  Without question, and he said Mr. Pickett

52

1  had approved it and Ms. Kelly had approved it.
2    Q.  What else did he tell you in that phone
3  conversation?
4    MR. TAYLOR: Objection, asked and
5  answered  You can answer it again, Don, if you
6  want to
7    THE WITNESS: I don't know, sir, what
8  else we talked about, the weather or whatever we
9  talked about, the future of the healthcare
10  business, I don't know.
11    BY MR KIRSHENBAUM:
12    Q.  Did you have any other conversations with
13  Mr Booth prior to the closing of this transaction?
14    A.  I am sure I did, but I can't remember
15  when. I talked to him on several different --
16    Q.  What did you discuss?
17    A.  Mr. Booth was in the middle up to his
18  ear-balls in negotiating and making sure from a
19  cash flow standpoint -- the properties were
20  profitable going in.
21    He wanted to make sure they stayed
22  profitable, and he wanted to make sure the payment
23  system and this is the payment system we asked him
24  to assume, I'm sure, which he agreed to. You know
25  Mr. Elkins is not going to do it, sir

53

1    Q.  You don't recall anything that you may
2  have discussed with Mr Booth in particular other
3  than Mr. Booth's telling you that he agreed to the
4  payment schedule, is that correct?
5    A.  That was all I needed.
6    Q.  So that's correct, you recall nothing
7  else about what Mr. Booth said to you?
8    A.  I can't remember what else he said. We
9  talked about the deal I'm sure, when it would
10  close, you know. They had to go through what do
11  you call it, the Hart -- it had to be approved
12  through the Taft Hartley.
13    Q.  Now, on page three of Exhibit A to the
14  Angell Agreement, there are a number of -- there
15  are a large group of numbers that are written in by
16  hand, do you see those?
17    A.  Yes, sir.
18    Q.  Who wrote those numbers?
19    A.  I don't know. I have no idea.
20    Q.  Did anyone write it -- no one wrote it
21  for you?
22    MR. TAYLOR: Objection He said he
23  didn't know who wrote it.
24    THE WITNESS: I don't know.
25    BY MR. KIRSHENBAUM:

14 (Pages 50 to 53)

54

1    Q.   Do you know who wrote it on behalf of
2  your organization?
3    A.   This could have been Mr. Booth changing
4  the numbers, I don't know.
5    Q.   You don't know?
6    A.   I don't know.  As long as I got my check
7  that's all that counts.
8    Q.   These are payments that were already
9  made, correct?
10   A.   They were made in '96, that's correct.
11   Q.   So are these — is this your handwritten
12 changes?
13   A.   No, sir.
14   Q.   And you don't recognize the handwriting?
15   A.   No, sir.
16   Q.   Now, turn back to section 6.4 of this
17 agreement, which is on page 11.
18   A.   Okay, sir.
19   Q.   Are you familiar with 10K reports,
20 correct?
21   A.   Somewhat, yes, sir.
22   Q.   And 10K reports are annual reports that
23 are followed by reporting companies?
24   A.   Yes, sir.
25   Q.   Are you familiar with that generally?

55

1    A.   Yes, sir.
2    Q.   Are you familiar with 10Q reports?
3    A.   To some extent, yes.
4    Q.   What are 10Qs?
5    A.   That's the quarterlies.
6    Q.   Section 6.4 says buyer has furnished the
7  Angell Group members with a correct and complete
8  copy of its report on form 10K for its fiscal years
9  ended December 31, 1996, it's proxy statement
10 prepared in connection with its annual meeting held
11 on June 20, 1997 and its special meeting held on
12 October 21, 1997, and each press release or other
13 schedule or report required by it to be publicly
14 disclosed or filed with the Securities And Exchange
15 Commission pursuant to the Exchange Act since
16 January 1, 1997.
17      Now, this agreement that you signed was
18 executed at the end of March 1998.  Do you recall
19 receiving the various 10Q reports that were issued
20 by IHS for its four quarters during 1997?
21      MR. TAYLOR:  Note my objection.
22      THE WITNESS:  I don't remember receiving
23 anything directly from Integrated other than the
24 press release that was sent to me on March 4th,
25 which basically what's year end 1997, and then was

56

1  quoted in the press release by Dr. Elkins that they
2  exceeded their 1996 number by like $35,000,000 or
3  something to that effect.
4      BY MR. KIRSHENBAUM:
5    Q.   So you don't recall receiving the
6  December 31, 1996 10K?
7    A.   Not unless it was in there, no, sir.
8    Q.   Did you read this agreement before you
9  signed it?
10   A.   Yes, I did.
11   Q.   And this agreement was true to the best
12 of your understanding?
13   A.   I was very pleased with the document,
14 yes, sir.
15   Q.   And you signed this agreement knowing
16 that it said that you received the 1996 10K and all
17 the reports issued during 1997?
18   A.   If you will read that carefully, sir,
19 buyer has furnished the Angell Group members with
20 correct and complete copies of its report.  The
21 members that it's referring to is Don R. House,
22 attorney.  I think Mr. House did receive a 10K, but
23 I did not get that, sir.  It says member.
24   Q.   Mr. House was acting on your behalf,
25 correct?

57

1    A.   Excuse me?
2    Q.   Mr. House was acting on your behalf,
3  correct?
4    A.   He was my attorney, that's correct.
5    Q.   And he was also a co-trustee of the
6  trust, is that correct?
7    A.   That's correct.
8    Q.   And were you relying on Mr. House to
9  review information and to discuss with you
10 information that he deemed to be relevant?
11   A.   Well, yes, and the reason we didn't have
12 any problems I'm sure with the 10K because
13 everything was fine.  This was prior to the 2 1
14 billion dollar loan and it was prior to the
15 $205,000,000 write-off, sir, when this document was
16 signed and read.
17      If you look at your 10Qs and 10Ks, this
18 document was beside before all the write-off was
19   Q.   When was the 2 1 billion dollar loan
20 entered into by IHS?
21   A.   If you look at page 155 of Mr. Pickett's
22 deposition, he will tell you that.  I have it here
23 some place.  Hold on just a minute, sir.
24      MR. TAYLOR:  Why don't you just answer
25 the question if you recall and know.  If you don't

15 (Pages 54 to 57)

58

1  know --
2       THE WITNESS:  I don't know a specific
3  date.
4       BY MR. KIRSHENBAUM:
5    Q.  Was it before or after March 31st?
6    A.  It was after.
7    Q.  There was no loan in place with the bank
8  syndicate prior to March 31, 1998?
9    A.  Not one that was ever disclosed to me,
10  no.
11    Q.  That's another question.  I'm asking you
12  whether, to your knowledge, there was a loan
13  agreement, a multi-billion dollar loan agreement in
14  place with the bank group prior to March 31, 1998?
15    A.  I have no knowledge.
16    Q.  Do you know whether that was disclosed in
17  the company's 10Q reports?
18    A.  I was not a shareholder, sir, and they
19  did not send me 10Qs.
20    Q.  Did you get the 10Qs in connection with
21  this deal?
22    A.  I had to reason to get it because it went
23  probably to my attorney.
24    Q.  It says in 6.4 that you received the 10Q
25  for 1997.

59

1    A.  It doesn't say me specifically, sir.  It
2  says members
3    Q.  And who was that?  You said you were the
4  sole negotiator on behalf of the entire Angell
5  Group?
6    A.  Well, I was the sole negotiator, but Mr.
7  House got a lot of the financial materials and such
8  as if it was received, it was received by him
9    Q.  And did you ask Mr. House what material
10  financial information was contained in the 1996 10K
11  and 19197 10Qs?
12       MR. TAYLOR:  Objection
13       THE WITNESS:  Yes, it showed -- very
14  simply the financial statements showed according to
15  Mr. House and according to my son that they had a
16  billion dollars worth of net worth.
17       BY MR. KIRSHENBAUM:
18    Q.  So your son was also involved in the
19  negotiations?
20       MR. TAYLOR:  Objection.
21       THE WITNESS:  No, he wasn't.
22       BY MR. KIRSHENBAUM:
23    Q.  Was your son involved in the due
24  diligence?
25    A.  No.  He pulled it up on the Internet and

60

1  looked at the financial statement.
2    Q.  So your son reviewed the financial
3  information that was available for this company in
4  1998?
5       MR. TAYLOR:  Objection.  Go ahead.
6       THE WITNESS:  It was for 1997, sir.  You
7  are misleading me.  I never saw a 1998 financial
8  statement.
9       BY MR. KIRSHENBAUM:
10    Q  We are talking about information that was
11  available in 1998 as of March 31, 1998  You are
12  testifying now that your lawyer and your son
13  reviewed the publicly available financial
14  information as of March 31, 1998, is that correct?
15       MR. TAYLOR:  I will ask you to stop
16  interrupting the witness and let him finish his
17  answer before you ask another question, sir.
18       Are you finished your answer to the prior
19  question?
20       THE WITNESS:  No, I am not.  There was no
21  way, sir, we had 1998 information  There was the
22  only thing available then was the 1996 and 1997.
23       There was no 1998 information available,
24  sir  I don't know where you are coming from on
25  that '98 business  It was never available.

61

1       In the press release that I received from
2  Mrs. Kelly was for 1997.  I mean, it was a quarter.
3  It might have been one quarter of '98, but there
4  was certainly not any financial statement.
5       BY MR. KIRSHENBAUM:
6    Q.  Would you agree with me that your lawyer
7  and your son reviewed the available financial
8  information for IHS, the publicly available
9  financial information before you executed this
10  agreement?
11       MR. TAYLOR:  Objection.  That's not what
12  he said  You can answer the question again, Don,
13  for the third time.
14       MR. KIRSHENBAUM:  Answer the question I
15  just asked.
16       MR. TAYLOR:  Note my objection to the
17  question he just asked.
18       MR. KIRSHENBAUM:  Please read back the
19  question.
20       THE WITNESS:  No, I want you to, sir.
21       MR. KIRSHENBAUM:  That's very nice, but
22  the court reporter will read back the question and
23  you will answer it.
24       (The record was read )
25       MR. TAYLOR:  Note my objection  Answer

16 (Pages 58 to 61)

62

1  the question.
2      THE WITNESS:  I would say they did in
3  1997, not 1998.  They reviewed the financial
4  statements that did not have the 2.1 billion dollar
5  loan to Citibank there.  They reviewed -- if they
6  reviewed it, I am assuming they did, the
7  $205,000,000 write-off that Mr. Pickett and Mrs.
8  Kelly and Mr. Elkins were getting ready to make.
9      They also didn't review the fact that
10  statement that came out later in '98 after he
11  signed the deal, that you were selling 17 percent
12  of your business, which was the home healthcare
13  business.
14      None of that was ever disclosed to us,
15  sir.  I don't care who read it, when it was read.
16  It was never disclosed.
17      BY MR. KIRSHENBAUM:
18  Q   Where does your son work, sir?
19  A   Where does my son work?  Is that
20  relevant?  He is a nursing home administrator.
21  Q   And does he work with you?
22  A   He operates the building we have, yeah.
23  Q   What's his business address?
24  A   Excuse me?
25  Q   What is his business address?

63

1  A   I don't have any idea.
2  Q   What city does he operate out of?
3  A   Advance, North Carolina.
4  Q   What's the name of his company?
5  A   He doesn't have a company.
6  Q   Who does he work for?
7  A   He is a nursing home administrator.
8  Q   Who does he work for?
9  A   Bermuda Village.
10  Q   Bermuda Village?
11  A   Uh-huh.
12  Q   Is that the name of the company that runs
13  the nursing home?
14  A   Yes.
15  Q   And where does Mr. House operate from?
16  What's his business address?
17  A   I don't know.
18  Q   What city does he work in?
19  A   Winston-Salem.
20  Q   To this day do Mr. House and your son
21  continue to be the co-trustees for the Angell
22  Trust?
23  A   Yes.
24  Q   Did you ask your son whether he had any
25  documents that fell within the scope of the

64

1  document production request?
2  A   Yes, we did.  I did.
3  Q   You went over it with your son?
4  A   No, sir, he didn't have.
5  Q   I asked whether you went over the
6  document production request with your son?
7  A   No.
8  Q   So he didn't review the document
9  production request?
10  A   He didn't review.  He just invests in a
11  lot of healthcare companies is the only way you
12  pull up the information -- let me finish please
13      Damn Yankees don't know when to stop.  He
14  reviewed several healthcare companies and basically
15  he invests in several of them, and that's the
16  reason he pulled it up
17  Q   So your son invests in home healthcare
18  companies?
19  A   You can call him.  I will give you his
20  telephone number if you want to call him.
21      MR. TAYLOR:  No, just answer the
22  question
23      BY MR. KIRSHENBAUM:
24  Q   What's his number?
25      MR. TAYLOR:  Let's get on to the

65

1  examination
2      MR. KIRSHENBAUM:  What's his number, Mr.
3  Angell?
4      THE WITNESS:  336-945-6112.
5      BY MR. KIRSHENBAUM:
6  Q   Is that his business number or home
7  number?
8  A   That's his business.
9  Q   Now, did you ask Mr House to review the
10  document -- I'm sorry, let me know, Mr. Taylor,
11  when you are done?
12      MR. TAYLOR:  Give me just a second
13      MR. KIRSHENBAUM:  Sure
14      THE WITNESS:  Go ahead.
15      BY MR. KIRSHENBAUM:
16  Q   Did you ask Mr. House to review his files
17  to see whether he had documents that fell under the
18  scope of the discovery order?
19  A   I did not, sir
20  Q   And Mr. House was the individual who
21  actually received the financial reports from IHS in
22  connection with negotiating this deal?
23  A   Sir, he possibly could.  I'm not certain
24  he even did.
25  Q   Now, you said you had certain internal

17 (Pages 62 to 65)

66

1  financial people who worked for you involved in
2  connection with negotiating the Angell Agreement?
3      A.  No, sir, I had certain internal
4  financial -- I'm sorry if you misunderstood this.
5  They gave me the effects it would have on us if we
6  went forward from a tax standpoint.
7      Q.  But that was their only involvement?
8      A.  Yes
9      Q.  Now, as best you can recall, Mr. Booth
10  actually told you that he agreed to the payment
11  schedule under the Premiere notes, is that correct?
12      A.  That's correct.
13      Q.  And you don't recall anything else in
14  particular that he said to you?
15      A.  No, sir, I don't.
16      Q.  Is that correct -- I'm sorry?
17      A.  No, sir.
18      Q.  Now, what can you recall specifically
19  that Mr. Pickett said to you, if you have any
20  specific recollection at all?
21      A.  Sir, Mr. Pickett, we perhaps talked
22  briefly in the beginning, but Mr. Pickett was in
23  charge of -- was the spirit to Mr. Booth and Mrs.
24  Kelly, and of course, Mr. Fishman, and all the
25  conversation that we had with that group, they had

67

1  to go back to Mr. Pickett for approval and
2  basically the conversation I'm sure that Mr. Swain
3  had it, but the conversation I had, sir, was
4  basically is always Mr. Pickett will have to
5  approve, Mr. Pickett will have to approve, that
6  type of relationship.
7      Q.  You don't recall anything specific that
8  Mr. Pickett ever said to you, is that correct?
9      A.  Other than the fact that I did see him at
10  the same meeting that Mr. Booth was at in DC and he
11  said it was very solvent and he felt like they
12  could handle the properties and be very profitable
13  for all involved.
14      Q.  Do you recall anything else that Mr.
15  Pickett said to you?
16      A.  No, sir.
17      Q.  And you said that was in DC?
18      A.  We had a nice financial long term
19  healthcare meeting every year.  In fact, Dr. Elkins
20  spoke at that.
21      Q.  Are you talking about the association
22  meeting?
23      A.  It was a financial meeting, yes.
24      Q.  But of the entire -- a very large meeting
25  of the healthcare industry generally, correct?

68

1      A.  There were several present.
2      Q.  Was the meeting of persons within the
3  healthcare industry generally, is that correct?
4      A.  Yes, sir
5      Q.  And you are just happening to bump into
6  Mr. Pickett during the course of that meeting?
7      A.  Mr. Pickett and Mr. Booth
8      Q.  And that meeting may very well have been
9  after March 31, 1998?
10      A  It was in the spring of '98, sir.
11      MR. KIRSHENBAUM:  John, I would like to
12  take two minutes.
13      MR. TAYLOR:  Fine.  That would be fine.
14      (Off-the-record, brief recess.)
15      MR. KIRSHENBAUM:  All right, John, at
16  this point in time I am going to turn the
17  questioning over to Mr. Aiken, and I would reserve
18  the right to pick up when Mr. Aiken is finished
19      EXAMINATION BY COUNSEL FOR
20  C. TAYLOR PICKETT AND DANIEL J. BOOTH
21      BY MR. AIKEN:
22      Q.  Hi, Mr. Angell, my name is Leighton Aiken
23  and I represent Mr. Pickett and Mr. Booth in
24  connection with the IHS bankruptcy proceeding, as
25  well as in the North Carolina lawsuit.  Do you

69

1  understand that?
2      A.  Yes, sir.
3      Q.  This process is a little cumbersome, so
4  I'm going to afford you the right to finish your
5  answers if you afford me the right to finish my
6  questions.  Is that agreeable?
7      A.  Thank you.
8      Q.  You talked in questions from Mr.
9  Kirshenbaum about an association meeting where you
10  saw a Mr. Pickett, and I believe you testified,
11  correct me if I'm wrong, that was sometime in 1998?
12      A.  In the spring, yes, sir.
13      Q.  Was that what they call euphemistically
14  as the NIC conference?
15      A.  That's correct.
16      Q.  And that was in Washington in 1998?
17      A.  That's correct, sir.
18      Q.  When was the first time you heard of the
19  prospect of IHS acquiring Premiere, approximately?
20      A.  Prospects was probably in the late fall
21  of '97 or early '98, sir.
22      Q.  How did you hear about that?
23      A.  From Mr. Swain.
24      Q.  Now, if you will take a look at
25  deposition Exhibit No. 4, which is the Angell

18 (Pages 66 to 69)

70

1  Agreement. My question to you -- that was signed I
2  believe we established on March 31, 1998 by
3  yourself?
4      A.  That's correct.
5      Q.  Between the late fall 1997 or early 1998
6  and when you signed the Angell Agreement on March
7  31, 1998, did you ever have a face to face meeting
8  with Mr. Pickett?
9          MR. TAYLOR: Objection, go ahead.
10         THE WITNESS: No, I did not, other than
11  the NIC meeting, and that was just a passing
12  meeting.
13         BY MR. AIKEN:
14     Q.  I'm sorry, I didn't hear you.
15     A.  That was for a very short time.
16     Q.  Do you recall -- and I know this was
17  awhile ago. Do you recall whether that NIC
18  conference meeting was before or after March 31,
19  1998?
20     A.  Sir, I cannot recall that.
21     Q.  Between the late fall 1997 and early 1998
22  when you first heard of the prospect of IHS
23  acquiring Premiere, through March 31, 1998, did you
24  ever speak with someone on the telephone who
25  identified himself as Mr. Pickett?

71

1      A.  Sir, I believe I did. I'm trying to
2  think of the date. That's the reason I didn't
3  answer you back.
4          Mr. Pickett, I can't remember the date he
5  took over. He was promoted from Mrs. Kelly's
6  present job. I talked with him briefly prior to
7  that, and I'm not sure of the date that that took
8  place. I'm just not sure, sir, what date it was.
9      Q.  Was there only one telephone conversation
10  possibly between the time you first heard about the
11  IHS acquisition and Premiere and March 31, 1998?
12     A.  I would say that's true, yes, sir, but I
13  was all -- are you finished?
14         MR. TAYLOR: Go ahead and finish.
15         THE WITNESS: I was always told by Mr.
16  Fishman, Mrs. Kelly that -- and Mr. Booth in any
17  conversation that I with them, that it would need
18  to be approved by Mr. Pickett.
19         BY MR. AIKEN:
20     Q.  Okay, I understand that. But with
21  respect to this one potential telephone call that
22  you had with Mr. Pickett between late fall, '97
23  early 1998 and March 31, 1998, can you explain to
24  me exactly what the nature of that telephone call
25  was?

72

1      A.  Well, it was the deal structure, sir. I
2  mean, that's what it was all about. Keep in mind,
3  and I said this a couple times -- let me repeat
4  myself -- the thing that I wanted to make sure,
5  number one, that I got paid.
6          I even tried to talk to Dr. Elkins about
7  it in a New York conference at one point, and
8  that's when he was involved in the community health
9  side and all that, and he was really happy to get
10  the properties because he felt like it fit the
11  bill.
12         But directly talking with Mr. Pickett,
13  which was your answer, I believe, it was always
14  related to me basically from Mr. Fishman and Mrs.
15  Kelly in conversation and Mr. Booth, that Mr.
16  Pickett was the man in charge of the acquisition.
17         He was the CFO and he was -- I can't even
18  remember your question. I'm rambling now, I'm
19  sorry.
20     Q.  I'm looking specifically for what you
21  recall in that potential one telephone call you had
22  with Mr. Booth between the -- I'm sorry, Mr.
23  Pickett between the late fall of '97 and when you
24  signed the Angell Agreement on March 1, 1990, what
25  is it that you specifically recall, if anything,

73

1  was discussed between you and Mr. Pickett on that
2  phone call?
3          MR. TAYLOR: Objection.
4          THE WITNESS: Typically in a conversation
5  like that when everything is going fine, the seller
6  is -- the buyer is going to tell how great
7  everything is.
8          When you talk in that terms, you see the
9  thing when we were negotiating, even though I
10  didn't talk to Mr. Pickett but one time, the
11  deterioration that I feel where I was wrong was the
12  fact that Mr. Pickett never picked up the telephone
13  and called me that they were taking a
14  2.5 million dollar write-off, and that they were
15  selling 17 percent of the home health services, and
16  that they had gotten a 2.1 billion dollar loan from
17  Citibank, which I know, and everyone else knows
18  that he knew about it, but yet he signed these
19  documents that you are referring to, sir, on the
20  documents.
21         He approved them for Mrs. Kelly's
22  signature and so did Mr. Booth, and that's the
23  problem. It didn't have to be a conversation, sir.
24  The documents speaks for themselves on what the
25  deal was and what the terminology was and these

19 (Pages 70 to 73)

74

1  were not -- they didn't live up to the documents,
2  sir.
3         I mean, I hate to be evasive or anything
4  like that about a conversation, but reality is a
5  different thing than being a question did you pick
6  up and talk -- they knew darn well that they were
7  in financial trouble when they signed these
8         They knew darn well they could have
9  called me and said, Don, there is something we got
10 a problem and you need to know about it. I never
11 heard that from them, sir.
12     BY MR. AIKEN:
13     Q.  Let me object to the responsiveness of
14 the answer.
15         I just need to know based on your
16 recollection, you said there might have been one
17 telephone call you had with Mr. Pickett between
18 late 1997 and 3/31/1998. I need to know whether
19 you recall what was discussed in that telephone
20 call. If you recall anything?
21     A.  I'm sure he told me what a great deal it
22 was.
23     Q.  Do you recall anything else?
24     A.  Excuse me?
25     Q.  Do you recall precisely -- not what you

75

1  think he said or what you are sure he might have
2  said, do you recall as you sit here today under
3  oath what he said to you and what you said to him?
4     A.  Sir, I could almost say, and be sure I am
5  under oath, I realize that, but you know it's also
6  been close to eight years ago that this
7  conversation took place.
8         But typically when you talk with Mr.
9  Pickett or Dr. Elkins or anyone that's an official
10 officer of a company, everything is going great
11 guns. We bought Rotech. We bought Horizon and,
12 you know, those were big acquisitions.
13         Now, did we discuss the financial
14 stability of a company, no, I am almost sure we
15 didn't do that because it was a billion dollar
16 company.
17     Q.  Do you recall anything else that you did
18 not discuss?
19     A.  I can't remember anything else, no.
20     Q.  Have you told us everything you recall
21 discussing with Mr. Pickett during this one
22 telephone conversation that you might have had with
23 him between the late fall of '97 and 3/31/98?
24     A.  I don't remember anything else, sir.
25     Q.  Now, you mentioned that the documents

76

1  were the deal. Is it your testimony that the
2  Angell Agreement set forth the entire -- your
3  entire understanding of the terms and conditions of
4  your agreement with IHS?
5     A.  It does.
6     Q.  Were there any terms or conditions not
7  contained in the Angell Agreement that you thought
8  were part of the deal?
9     A.  Not to my knowledge
10    Q.  Between the time that you signed the
11 Angell Agreement on March 31, 1998 and the day the
12 transaction closed on June 25, 1998, did you ever
13 meet during that time frame with Dan Booth?
14    A.  With who?
15    Q.  Dan Booth?
16    A.  Yeah, I met Dan Booth in Owings Mill --
17 is it Owings Mill or Mill Owings?
18    Q.  Owings Mill.
19    A.  Okay, where the company is, I met Dan.
20    Q.  So you believe that you met Dan between
21 March 31, 1998 and June 25, 1998?
22    A.  I don't believe -- I know I did.
23    Q.  Were you in his office?
24    A.  Yes, sir, I was in his office
25    Q.  Can you recall --

77

1     A.  I also met with Elizabeth Kelly and also
2  Mr. Fishman and Mr. Pickett stuck his head in the
3  door and said hello. He was not in on the
4  discussions
5     Q.  Do you recall during that meeting what,
6  if anything, Mr. Booth told you concerning the
7  Premiere transaction?
8     A.  Well, the thing I had a concern about,
9  number one, I didn't want to be bought out, sir.
10 In other words, I didn't want to cash out for tax
11 purposes, as I mentioned earlier. I talked to Mr.
12 Booth and Ms. Kelly about a transaction -- both
13 were in the room -- about the possibility of
14 converting the note that they owed me to assets
15 that they owned in North Carolina.
16        There was -- the only thing is they were
17 going to get back with me. Then finally Mr. Booth
18 got back with me one day and said Don, I can't do
19 that because the bank has a lien on them. I said
20 do they have a lien on everything? He said they
21 have a lien on the buildings. I said, oh, and you
22 know, then I talked to Mr. Booth on several
23 occasions after the deal was closed about my
24 payment each month.
25        It goes slower and slower and slower, and

20 (Pages 74 to 77)

78

1  Dan was the contact  Finally on the end in late
2  '99 Dan didn't return calls at all, but he knew
3  exactly what the deal was all about and he knew --
4  he said I would pay you -- in fact, we got a TRO,
5  sir
6       They could not -- in the documents they
7  could not upstream money without if they didn't pay
8  us from that and we are going into -- we have a TRO
9  in Winston-Salem, Forsyth County court and they
10  sent the money on then, but that was in like
11  November of '99  But Dan was in it all the way
12       In other words, he knew exactly what this
13  deal was about, what the subordination agreement
14  stated and it's just continuing on all over.
15    Q.  We sort of ran a little far afield from
16  this one meeting in Owings Mill  Do you recall --
17    A.  Excuse me, it was all discussed there,
18  sir. That's what was discussed. You asked me
19    Q.  The TRO was discussed in the meeting?
20    A.  No, not that, I'm sorry
21    Q.  Here is my question, very simply  Is it
22  fair to say, and correct me if I'm wrong, that you
23  went to Owings Mill to discuss with Integrated and
24  specifically its officers, including Mr. Booth,
25  that you didn't want to cash out for tax purposes

79

1  and whether they were willing to convert the notes
2  which were not guaranteed yet by Integrated, but
3  whether Integrated once the deal went down was
4  willing to convert the notes to liens on
5  Integrated's assets. Is that what was discussed?
6    A.  Not lease on Integrated's assets, but to
7  buy Integrated assets.
8    Q.  So the discussions centered solely on
9  converting the notes for hard assets owned by
10  Integrated?
11    A.  That's correct
12    Q.  Anything else discussed at that meeting
13  in Owings Mill that Mr. Booth attended?
14    A.  Not to my knowledge, sir.
15    Q.  Mr. Aiken, the Angell Agreement which is
16  marked as Exhibit No  4, is this the only agreement
17  to which both you and Integrated are signatories
18  prior to and including June 25, 1998?
19    A  Sir, I don't think there is another one
20  that I know of other than --
21    Q  Now again, between March 31, 1998 and
22  June 25, 1998, did you ever meet with Mr. Pickett
23  during that time period other than maybe at the NIC
24  conference?
25    A  I can't honestly say I can, but

80

1  everything that was said that Mr. Pickett would
2  have to approve it from Mrs. Kelly's standpoint and
3  Mr. Booth's standpoint, his name always came up in
4  the conversation.
5    Q.  I understand that testimony, but my
6  question is very specific.  Between March 31, 1998
7  and June 25, 1998, do you ever recall meeting with
8  Mr. Pickett?
9    A.  Say that one more -- what's the dates
10  again, sir?
11    Q  Between the day you signed the Angell
12  Agreement on March 31, 1998 and the day the
13  transaction closed on June 25, 1998, do you ever
14  recall meeting with Mr. Pickett?
15    A  I recall, sir -- I recall, as I told you,
16  he stuck his head in the door in a meeting we had
17  there, sir, but --
18    Q  He just said hello, right?
19    A.  Yes.
20    Q  That's the only time, is that correct,
21  between that time frame?
22    A  Yes
23    Q.  Between that same time frame, the Angell
24  Agreement dated March 31, 1998 and the closing of
25  the transaction June 25, 1998, do you ever recall

81

1  talking with anyone who identified themself as Mr.
2  Pickett?
3    A.  I don't remember, sir. I very well could
4  have, but I don't remember.
5    Q.  Same with Mr. Booth, other than the
6  meeting in Owings Mill that you recall between
7  March 31, 1998 and June 25, 1998, did you have any
8  conversations via phone or in writing with anyone
9  identifying themselves as Dan Booth?
10    A  Quite frequently, yes
11    Q.  And what were the nature of those
12  conversations, again, just between that time frame?
13    A  Actually, it was a continuation of what
14  we discussed about as I earlier -- the other
15  attorney addressed, the payment schedules, what
16  basically they were doing as far as the trend to
17  convert the notes to assets here in North Carolina.
18  We had several conversations on that particular
19  topic, sir.
20    Q.  Is it fair to say then, Mr. Angell, and
21  correct me if I'm wrong, that between March 31,
22  1998 and June 25, 1998, the conversations that you
23  had with Mr. Booth related solely to the payment
24  schedule that's attached to the Angell Agreement as
25  Exhibit A and converting the notes to hard assets

21 (Pages 78 to 81)

82

1  that were then owned by IHS?
2      A.  And you know --
3      Q.  Just answer that.
4      A.  Wait just a minute. No. The other thing
5  that Dan and I discussed was the fact of the matter
6  that my notes couldn't be pledged. My notes were
7  subordinate to the other debt of Integrated
8  Healthcare and the reason where we really found
9  that out, sir, they started looking at the
10  standpoint I think in retrospect what they had done
11  to my notes by assigning them to Citibank, and went
12  never knew for a fact they had until they went into
13  bankruptcy.
14      But the fact of the matter was I had a
15  lot of discussion about the security of my notes
16  with Dan.
17      Q.  Anything else you recall?
18      A.  No, sir.
19      Q.  Talking to Mr. Booth about?
20      A.  No, sir
21      Q.  So let me just summarize again, between
22  March 31, 1998 and June 25, 1998, you recall
23  talking to Mr Booth about the payment schedule
24  attached as Exhibit A to the Angell Agreement,
25  converting your notes to hard assets then owned by

83

1  IHS, and the fact that your notes couldn't be
2  pledged, is that correct?
3      A.  That's correct.
4      Q.  Anything else you recall?
5      A.  No, sir.
6      Q.  From March 31, 1998 through June 25,
7  1998?
8      A.  No, sir.
9      Q.  Mr. Angell, do you know whether anybody
10  ever sued IHS for securities fraud in connection
11  with misrepresentations or omissions in their
12  public filings?
13      A.  I really do not know, sir.
14      Q  Let's talk about the fact that your notes
15  couldn't be pledged. Do you view there to be a
16  difference between pledging notes and pledging
17  stock of the guarantor of those notes, namely IHS?
18      A.  I don't follow your question, I'm sorry,
19  sir.
20      MR. TAYLOR: Note my objection to the
21  form.
22      BY MR. AIKEN:
23      Q.  What document are you relying on if you
24  are relying on a document that said that the notes
25  that Premiere as the maker gave to you as part of

84

1  the transaction that were guaranteed by IHS, that
2  those notes could not be pledged?
3      MR. TAYLOR: Objection to form. Go
4  ahead.
5      THE WITNESS: Sir, if you go to
6  section —
7      BY MR. AIKEN:
8      Q.  What exhibit?
9      A.  I'm getting ready to tell you. Hold on
10  It's Exhibit No 5
11      Q.  Okay, what in Exhibit No. 5, which is the
12  guaranty of payments are you relying on to say that
13  Premiere —
14      A.  Give me just a moment, okay Section
15  one, the guaranty of payments, the guarantor hereby
16  unconditionally guarantees to the lender joint and
17  served with any other present and future guarantor
18  the timely payment. I won't read it all, but
19  that's basically the — let me go to section two on
20  page two, sir
21      Obligation unconditionally, the
22  obligation of the guarantor hereby or absolute and
23  unconditionally and are not subject to the defense
24  or any right of offset and set-off. The
25  set-off basically means — in my book the set-off

85

1  means that you are using it for something else,
2  counterclaim or recoupment arising net.
3      You go down to section three, sir, the
4  event of defaults, each as follows breach and by
5  the borrower, the guarantor of any of these
6  provisions or any of the notes, loan failure by the
7  guarantor to pay any amount required to be paid
8  hereunder when due, but the one that's most
9  important, sir, in my opinion is section five,
10  number three.
11      Section five, number three is a
12  subordination. Upon the event of default after
13  notice and the expiration of appropriate cure
14  period, any indebtedness, fee or other obligations
15  of the borrower to the guarantor now and hereafter
16  exists together with any interest thereon, shall
17  be, and each such indebtedness, fee or any other
18  obligation — listen close to this, sir, is hereby
19  deferred, postponed and subordinate to the
20  repayment of indebtedness
21      That specifically states that my notes
22  are senior to Citicorp's 2.1 billion dollars. My
23  notes are senior to any debt that Integrated
24  Healthcare Services basically incurs. Instead of
25  it being pledged or whatever they did, I don't care

22 (Pages 82 to 85)

**86**

1 what you call it, they paid for a 2.1 billion
2 dollar loan. They pledged these assets, whether it
3 be notes, stock, assets or whatever you want --
4 whatever the best thing was to do, probably all of
5 the above.
6         See, I gave up two gentlemen that I have
7 known most of my life, signature, to let them buy
8 these buildings  I gave up -- sir, listen closely
9 to this. I gave up the personal signature -- I
10 gave up the leases, which are the value in order
11 for Integrated Healthcare to buy these buildings.
12         I gave up the stock in the corporation.
13 I gave up their lien on the receivables and for
14 Integrated to purchase this
15         The only way I would do that if I knew
16 that everything was subordinated to my note and,
17 sir, I know I rambled, but it's my heart felt
18 feeling that that number five says it all.
19     Q   Let's talk about that then. You are
20 referring to section five of the guaranty of
21 payment that's been marked as Exhibit No. 5 to your
22 deposition?
23     A   That's correct, page three, section five.
24     Q   Who, if anyone, reviewed this on your
25 behalf prior to the closing of the Premiere IHS

**87**

1 transaction on June 25, 1998?
2     A   Don R. House, from a legal standpoint
3     Q   And was it your understanding that
4 section five -- in section five IHS was
5 subordinating -- strike that. Was it your
6 understanding from section five that Premiere was
7 subordinating all of its indebtedness to payment of
8 your notes?
9         MR. TAYLOR: Object to the form. Go
10 ahead  I just objected to the form of the
11 question  You can answer.
12         THE WITNESS: I don't follow his
13 question, I'm sorry
14         BY MR. AIKEN:
15     Q   I will rephrase it. Under section five,
16 did you understand that Premiere Associates, Inc.
17 was agreeing to subordinate all of its company's
18 indebtedness to the payment of your notes?
19         MR. TAYLOR: Objection.
20         THE WITNESS: Both Premiere and
21 Integrated. It was not just Premiere. They were
22 not --
23         BY MR AIKEN:
24     Q   That was your understanding?
25     A   They were both Premiere and Integrated

**88**

1 Healthcare Services, not just Premiere but
2 Integrated
3     Q   And to the extent that the language does
4 not support your interpretation that the
5 indebtedness of IHS was subordinated to your notes,
6 do you blame Mr. House for that?
7     A   No, sir. I don't blame Mr. House because
8 I blame Elizabeth Kelly, executive vice president
9 of corporate development  She signed it on behalf
10 of Integrated Healthcare Services, sir.
11     Q   Let's just break it down a little bit.
12 The borrower in this document is Premiere
13 Associates, Inc., correct?
14     A   Premiere didn't sign this document, sir
15     Q   Look in the first paragraph of the
16 document  It defines borrower  Borrower is
17 defined as Premiere Associates, Inc , correct?
18     A   Yes, but it's a guarantor of Integrated
19 Healthcare Services, sir.
20     Q   And Integrated Health Services is defined
21 as the guarantor, correct?
22     A   That's correct, executive -- Elizabeth
23 Kelly, executive vice president and corporate
24 development which answered to Mr. Pickett
25     Q   Now, did you understand that in the event

**89**

1 of a default, that the debt that was supposed to be
2 subordinated under this document was the debt that
3 Premiere owed to IHS?
4         MR. TAYLOR: Objection.
5         THE WITNESS: It was the debt that was
6 owed to me.
7         BY MR. AIKEN:
8     Q   I understand, but the debt that was being
9 subordinated, the debt you were senior to was the
10 debt that Premiere owed to IHS?
11         MR. TAYLOR: Objection.
12         THE WITNESS: It was money owed to me
13         BY MR. AIKEN:
14     Q   Is that your understanding?
15     A   No, it was owed to me
16     Q   You said you were senior, you were the
17 first one to be paid?
18     A   That's correct
19     Q   Did you think you were the first one to
20 be paid in respect to debt that was owed from
21 Premiere to IHS or from Premiere to any entity?
22         MR. TAYLOR: Objection.
23         THE WITNESS: Not particularly -- well,
24 you can call it anything you want. If it was
25 Premiere, I was supposed to get paid first and if

23 (Pages 86 to 89)

90

1  it was IHS, I was supposed to get paid first. They
2  did not have the ability to pledge my assets
3      BY MR. AIKEN:
4      Q.  Where in here does it say that the notes
5  were pledged?
6      A.  Well, it doesn't say they are pledged in
7  this, sir, because that's the reason for the
8  subordination agreement, but they were pledged.
9      Q.  Explain to me what document -- how do you
10  know your notes were pledged?
11      A.  It came out in the bankruptcy and we
12  found out about it after the fact that they pledged
13  them up on closing of the deal. They had to  They
14  didn't give us that documentation, sir. Mr Booth
15  and Mr. Pickett and Ms. Kelly pledged our notes
16  knowing full well that they had to do it to have a
17  2.1 billion dollar loan, sir.
18      Q.  Were the notes pledged to Citibank or was
19  IHS's -- or was Premiere's stock pledged to
20  Citibank?
21      A.  I don't know, but when it went into
22  bankruptcy, sir, I didn't get a damn thing back and
23  the --
24      Q.  Just like millions of other creditors,
25  correct?

91

1      MR TAYLOR: Objection
2      THE WITNESS: Well, it means a lot to me,
3  sir. I'm the only creditor is my understanding of
4  the entire IHS that has a subordination to the
5  notes that were treated like that. They did it
6  without my approval. They took my life savings and
7  pledged it for something they didn't have the right
8  to do, Mr. Aiken. They had no right to do what
9  they did and you can read into that
10      That's subordination is subordination,
11  whether you are in Texas or New York or
12  Winston-Salem. They had no right to do that.
13  Those three people did it. They did it
14      BY MR. AIKEN:
15      Q.  Let me ask you very simply this. Does
16  section five of the guaranty marked as Exhibit No.
17  5, does that contain the entire language concerning
18  your understanding of what was subordinated
19  vis-a-vis your notes?
20      MR. TAYLOR: Objection.
21      THE WITNESS: Well, there are other reps
22  in the agreements and things that refer, but the
23  subordination is number one in my book.
24      BY MR. AIKEN:
25      Q.  And does section five of Exhibit No. 5 In

92

1  the guaranty of payment contain the entire language
2  that you are relying upon regarding subordination
3  in respect of your notes?
4      MR. TAYLOR: Objection
5      THE WITNESS: I have to refer to my
6  attorneys on that
7      BY MR. AIKEN:
8      Q.  I'm asking you. I'm asking you if you
9  know of anything other than this language that you
10  are relying on --
11      A.  I'm sure it is. I'm sure, but today
12  right there is what subordination means what it
13  says
14      Q.  So you are relying on the language of
15  section five regarding —
16      A.  I didn't say that. That's the greater
17  portion of it. I'm sure if you reviewed the
18  documents, you would find other statements.
19      Q.  Well, I have reviewed the documents and I
20  haven't, so I need you to point that to me. So my
21  question is, as you sit here today under oath
22  concerning subordination by Premiere, IHS or anyone
23  else to the debts evidenced by your notes, are you
24  aware of any subordination language other than that
25  which is reflective on section five of Exhibit No.

93

1  5 entitled guaranty of payment?
2      MR. TAYLOR: Note my objection  Don, you
3  can explain to him what the meaning of this
4  agreement does and attempt to answer his question
5  the best you can.
6      THE WITNESS: Well, what the agreement
7  does on this particular Exhibit No. 5 is basically
8  a guaranty of payment anyway you cut it, sir, and
9  it says it throughout there is a guaranty of
10  payment here from section one all the way through,
11  sir.
12      BY MR. AIKEN:
13      Q.  You talked about that debt was being
14  subordinated to payment of your notes and, Mr.
15  Angell, it's real simple. I just want to know
16  whether you are relying on any language concerning
17  subordination of payments to the indebtedness
18  evidenced by your notes, if you are relying on any
19  language other than section five of Exhibit No. 5
20  entitled guaranty of payment?
21      MR. TAYLOR: Objection  He already
22  testified that other sections of the document were
23  important to him, but I will let him answer the
24  question.
25      MR AIKEN: Counsel, that's not my

24 (Pages 90 to 93)

94

1  question, and you can object to form and whatever.
2       My question is very simply, Mr. Angell,
3  are you relying on section five of Exhibit No. 5 of
4  the guaranty of payments regarding your claim that
5  there was some sort of fraud or wrongdoing
6  concerning subordination of any indebtedness by
7  Premiere or IHS to the debt evidenced by your
8  notes?
9       MR. TAYLOR: Note my objection to form
10      THE WITNESS: Sir, give me about three
11 minutes
12      BY MR AIKEN:
13  Q.  No, I need you to answer this question
14  A   I'm going to answer it.
15  Q   If you need to review anything, feel free
16 to review.
17  A.  Give me three minutes to answer.  This
18 guaranty of payment, sir, was dated the 25th day of
19 June 1998  You go down and basically not to read
20 every paragraph, but the second paragraph, the
21 guaranty has agreed to acquire all of the issued
22 and outstanding corporate stock of borrower from
23 the shareholders, all the shareholders etc., etc.,
24 etc.  Go down to section one
25      The guaranty of payment, the guaranty

95

1  hereby unconditionally guarantees through lender
2  jointly and severally with any other present  Now,
3  that doesn't say Premiere, sir  It doesn't say
4  anything, but it's a guaranty of payment, section
5  one  Then you go back and you look to limitations
6  and things of that nature of the loan document and
7  then section two is the obligation unconditionally
8  and what that is doing, that doesn't give you any
9  right -- I think this answers your question you
10 just asked.
11      The obligation of the guaranty here are
12 absolutely and unconditionally not subject to any
13 defense or any right of set-off.  In other words,
14 you can't set off any payment that would be made
15 counterclaim or recoupment. Then you get into the
16 breaches of default and remnants of default. Then
17 you go to the subordination agreement which we have
18 spoken.
19      Then you go to number six, the waiver of
20 rights.  The guaranty expressly waives notice of
21 accepting of this guaranty by the lender, any
22 impairment modification release limitations, then
23 you get down as the primary liability of the
24 guarantor and what they are guaranteeing  Then you
25 get in section eight, term of the guaranty.

96

1       Sir, to say there is one paragraph that
2  stands out other more than other -- this document
3  in my opinion, Exhibit No. 5, expresses that your
4  clients have guaranteed my payment regardless
5  Q.  When you say "my clients," you mean Mr
6  Pickett and Mr. Booth or IHS?
7  A.  Mr. Pickett and Mr. Booth and Ms Kelly
8  signed it.  Mr. Pickett was Mrs. Kelly's boss and
9  she didn't do one thing without Mr. Pickett's
10 approval, and Mr. Booth didn't do one thing without
11 the approval.  Mr. Booth is the one that went out
12 and got the 2.1 billion dollar loan knowing full
13 well they are going to have to pledge my stock to
14 do it.
15 Q.  Perhaps you can relate to this, Mr
16 Angell.  You are running the four corners on me
17 So let's get down to the document instead of your
18 rambling answers
19  A   I'm not going to shoot any time.
20      MR TAYLOR: Objection.
21      THE WITNESS: If I'm running four
22 corners, you are damn right I'm going to keep
23 going. This document is the document, sir.  It's
24 not just a subordination agreement.  They are
25 guaranteeing to pay me, and your client has signed

97

1  it.
2       BY MR AIKEN:
3  Q   Did Mr. Booth sign this document?
4  A   No, Ms. Kelly did.
5  Q.  I don't represent Ms Kelly  My question
6  is did Mr. Booth --
7  A.  Somebody needs to represent her
8  Q.  Let me finish my question  Did either
9  Mr. Booth or Mr. Pickett execute the guaranty of
10 payment that is marked as Exhibit No. 5 to your
11 deposition?
12  A.  But they approved it.
13  Q.  Answer my question  Did they sign it?
14  A.  No, they did not sign it, but they
15 approved it because the chain of command very
16 simply was Ms Kelly had no authority without your
17 client, Mr. Pickett approving it and you know that.
18  Q.  How do you know that?
19  A.  I know it for a fact.
20  Q.  How do you know it for a fact?
21  A   The infrastructure, I heard it come out
22 in bankruptcy.  If you gone to Delaware with me the
23 many times I been up there since this thing has
24 gone under, you would know more about it, sir.
25  Q   Let me just ask you very simply --

25 (Pages 94 to 97)

98

1    A.  Excuse me, I have met Mr. Pickett for a
2  long talk in the bankruptcy court.
3    Q.  Okay, that's after June 25, 1998,
4  correct?
5    A.  Yeah, but I just wanted you to know I met
6  him.
7    Q.  Now, very simply it the guaranty of
8  payment marked Exhibit No. 5, is it your position
9  that that contains all the obligations of IHS in
10  connection with the guaranty of the payments in
11  connection with your notes and the plaintiffs'
12  notes?
13    MR. TAYLOR:  Objection.
14    THE WITNESS:  I would say yes.
15    BY MR. AIKEN:
16    Q.  Are there any agreements that you are
17  aware of or obligations not contained in Exhibit
18  No. 5 that you are relying on?
19    A.  Yes.
20    Q.  In connection with the payment of the
21  plaintiffs' notes?
22    A.  Yes.  Let me get the certificate,
23  officer's certificate.  You put these two together
24  and that's all anybody needs, the officer's
25  certificate dated June 25th by Mrs. Kelly who was a

99

1  subordinate of Mr. Pickett
2    Mr. Pickett could not tell you under oath
3  that he didn't know about these two being signed
4  and authorizing them, the officer's certificate,
5  these two documents right there.
6    Q  Mr. Angell, very simply, with respect to
7  payment that the obligations of Integrated with
8  respect to payment of the plaintiff's notes, are
9  all the terms and conditions concerning
10  Integrated's obligations to guaranty that payment,
11  are they contained in Exhibit No. 5?
12    MR. TAYLOR:  Objection.
13    THE WITNESS:  I am not going to go on --
14  out on a limb because there could be something I
15  haven't read, sir, but --
16    BY MR. AIKEN:
17    Q.  As you sit here today -- as you sit here
18  today, are you aware of anything, other documents
19  that contained IHS's obligations concerning
20  guaranteeing the payment of the plaintiffs' notes
21  other than what's in Exhibit No. 5?
22    MR. TAYLOR:  Objection.
23    THE WITNESS:  Let me answer it this way.
24  I don't know of another document that's as strong
25  as this.  There could be others that relate to

100

1  this, but I don't know of any document that's as
2  strong as these two are.
3    BY MR. AIKEN:
4    Q.  Are you aware of any document other than
5  Exhibit No. 5 that contains IHS' obligations to
6  guaranty payments by Premiere to the plaintiffs
7  under their notes as you sit here today, any other
8  documents?
9    MR. TAYLOR:  Objection.
10    THE WITNESS:  Yes, Exhibit No. 6 does.
11    BY MR. AIKEN:
12    Q.  Okay No.'s 5 and 6.  Are you aware of any
13  other documents?
14    MR. TAYLOR:  Objection.
15    THE WITNESS:  Are you objecting?
16    MR. TAYLOR:  Go ahead.
17    THE WITNESS:  I'm sure they are out
18  there, but I can't pull them right out of my hat at
19  this point.  I'm sure it's related to throughout,
20  particularly in the Exhibit No. 4 where you have
21  the reps and warranties.
22    BY MR. AIKEN:
23    Q  Are you aware of any document or language
24  in any document that barred Premiere Associates
25  from pledging its stock?

101

1    A.  Yes.
2    Q.  What is that?
3    A.  Section two -- excuse me.  The
4  subordination agreement very basically says upon
5  the event of default after notice and expiration,
6  any indebtedness fee or obligation of the borrower
7  to the guarantor now and hereafter existing
8  together with the interest thereon, shall be and
9  each such indebtedness, fee or other obligation, is
10  hereby deferred, postponed and subordinated to the
11  repayment of the indebtedness.
12    Now, if that doesn't say that you can't
13  borrow against it -- if you borrow against it, it's
14  supposed to be first.  If section five,
15  subordination page three had been adhered to, we
16  wouldn't be here today.  If he hadn't pledged the
17  stock to Citibank, we would not have been in this
18  room today.
19    Q.  And you believe section five -- you
20  believe section five prohibits Premiere's pledge of
21  stock to Citibank?
22    A.  Sure it does.
23    Q.  Mr. Angell, did you file proofs of claim
24  against Premiere in the bankruptcy regarding
25  Premiere's obligations under the plaintiffs' notes?

26 (Pages 98 to 101)

102

1         MR. TAYLOR: Objection.
2         THE WITNESS: Well, I don't know what we
3    filed in bankruptcy court. There has been so much
4    filed. I have no idea what was filed. My
5    bankruptcy attorney representing me aren't here.
6         BY MR. AIKEN:
7    Q.   Do you recall whether you or the other
8    plaintiffs in the North Carolina suit filed proofs
9    of claim against IHS in the bankruptcy concerning
10   IHS' obligations under the guaranty?
11        MR. TAYLOR: Objection.
12        THE WITNESS: I would say we did it both
13   on Premiere and IHS. I don't know for sure,
14   though.
15        BY MR. AIKEN:
16   Q.   Assuming that you did, were those proofs
17   of claim an effort to recover for damages arising
18   under the notes, the plaintiffs' notes that are
19   referenced in the North Carolina lawsuit?
20        MR. TAYLOR: Objection.
21        THE WITNESS: I don't know. You are
22   going some place I'm not familiar with in the
23   bankruptcy.
24        BY MR. AIKEN:
25   Q.   So you don't know why you filed proofs of

103

1    claim?
2    A.   We.
3         MR. TAYLOR: Objection
4         THE WITNESS: We had five different
5    bankruptcy attorneys working on this. I don't
6    know. I can't honestly tell you.
7         BY MR. AIKEN:
8    Q.   Mr. Angell, did you ask for any opinions
9    of counsel that would opine to you and give you
10   comfort that the terms of the Angell Agreement did
11   not conflict with any other terms of agreements of
12   IHS?
13        MR. TAYLOR: Objection. Object to
14   attorney/client privilege. You don't need to
15   testify about matters that you discussed with your
16   counsel.
17        THE WITNESS: Okay
18        BY MR. AIKEN:
19   Q.   I don't think asking whether you
20   requested something is attorney/client. Are you
21   going to stand on that objection?
22        MR. TAYLOR: Well, you can answer that
23   question yes or no, but you are not to get into any
24   specifics of conversations you had, but I will
25   object to the objection of the scope of the

104

1    question to whether it falls within the scope of
2    Judge Walrath's order, but I will instruct you to
3    answer yes or no.
4         THE WITNESS: No.
5         BY MR. AIKEN:
6    Q.   I'm sorry, what was the answer?
7    A.   No.
8    Q.   The same question, did you ask for any
9    legal opinion from counsel that the terms of the
10   guaranty did not conflict with any terms and
11   conditions of other agreements of IHS?
12        MR. TAYLOR: Same objection, same
13   instruction.
14        THE WITNESS: No.
15        BY MR. AIKEN:
16   Q.   Did you receive any legal opinions, you
17   meaning Don G. Angell, receive any legal opinions
18   from counsel for IHS that the terms of the Angell
19   Agreement did not conflict with any other
20   agreements that IHS was a party to?
21        MR. TAYLOR: You are asking from counsel
22   from IHS?
23        MR. AIKEN: Yes.
24        MR. TAYLOR: Answer if you know.
25        THE WITNESS: I don't know. You are way

105

1    out in right field now.
2         BY MR. AIKEN:
3    Q.   Have you ever considered filing a claim
4    against any counsel that represented you in
5    connection with the Premiere, IHS acquisition?
6    A.   No, can't afford it
7         MR. AIKEN: I will pass the witness.
8         MR KIRSHENBAUM: Let's take a two minute
9    break.
10        (Off-the-record, brief recess )
11        MR. KIRSHENBAUM: John
12        MR. TAYLOR: Yes
13        MR. KIRSHENBAUM: We are not going to ask
14   any further questions.
15        (Continued on the following page )
16
17
18
19
20
21
22
23
24
25

27 (Pages 102 to 105)

106

1    MR. TAYLOR:  All right.  I have no
2  questions.
3        (Signature reserved.)
4        (Whereupon, at 4:05 p.m., the taking of
5  the instant deposition ceased.)
6

7    _____
     Signature of the Witness
8  SUBSCRIBED and SWORN TO before me this_____day
9  of _____, 20___
10
11   _____
12            NOTARY PUBLIC
13
14 My Commission expires:_____
15
16
17                    .
18
19
20
21
22
23
24
25

108

1  Page ___ Line ___ should
2  read:_____
3  Page ___ Line ___ should
4  read:_____
5  Page ___ Line ___ should
6  read:_____
7  Page ___ Line ___ should
8  read:_____
9  Page ___ Line ___ should
10 read:_____
11 Page ___ Line ___ should
12 read:_____
13 Page ___ Line ___ should
14 read:_____
15 Page ___ Line ___ should
16 read:_____
17 Page ___ Line ___ should
18 read:_____
19 Page ___ Line ___ should
20 read:_____
21 Page ___ Line ___ should
22 read:_____
23 Page ___ Line ___ should
24 read:_____
25 ALN

107

1        ERRATA SHEET
2  IN RE: INTEGRATED HEALTH SERVICES, INC., ET AL.
3  DEPOSITION OF:  DON G. ANGELL
4      Please read this original deposition with
5  care, and if you find any corrections or changes
6  you wish made, list them by page and line number
7  below.  DO NOT WRITE IN THE DEPOSITION ITSELF.
8  Return the deposition to this office after it is
9  signed.  We would appreciate your prompt attention
10 to this matter.
11     To assist you in making any such
12 corrections, please use the form below.  If
13 supplemental or additional pages are necessary,
14 please furnish same and attach them to this errata
15 sheet.
16 Page ___ Line ___ should
17 read:_____
18 Page ___ Line ___ should
19 read:_____
20 Page ___ Line ___ should
21 read:_____
22 Page ___ Line ___ should
23 read:_____
24 Page ___ Line ___ should
25 read:_____

109

1        CERTIFICATE OF REPORTER
2
3  STATE OF NORTH CAROLINA )
4  COUNTY OF MECKLENBURG )
5      I, Andrea L. Nobrega, the officer before
6  whom the foregoing deposition was taken, do hereby
7  certify that the witness whose testimony appears in
8  the foregoing deposition was duly sworn by me; that
9  the testimony of said witness was taken by me to
10 the best of my ability and thereafter reduced to
11 typewriting under my direction;  that I am neither
12 counsel for, related to, nor employed by any of the
13 parties to the action in which this deposition was
14 taken, and further that I am not a relative or
15 employee of any attorney or counsel employed by the
16 parties thereto, nor financially or otherwise
17 interested in the outcome of the action.
18
      _____
19        ANDREA L. NOBREGA
20        Court Reporter and Notary
21        Public in and for North
22        Carolina
23
24
25 My commission expires: 11-25-06

28 (Pages 106 to 109)

**A**

aalfonso@kayeschole... 2:9
ability 90:2 109:10
able 48:3
absolute 84:22
absolutely 95:12
accepting 95:21
accountants 36:10
accountings 36:6
acquire 94:21
acquiring 69:19 70:23
acquisition 5:15 71:11 72:16 105:5
acquisitions 27:19,20 75:12
Act 55:15
acting 56:24 57:2
action 6:10,14,22 109:13,17
active 23:4,6
addendum 43:16
additional 6:13 107:13
address 62:23,25 63:16
addressed 81:15
adhered 101:15
Administered 1:6
administrative 49:5
administrator 62:20 63:7
admitted 8:11,12
Advance 63:3
affiliated 17:6 21:3
affiliates 15:20
afford 69:4,5 105:6
afield 78:15
afternoon 6:16 7:4,6
agent 5:20
agents 5:15 23:13
ago 70:17 75:6
agree 6:20 31:15 51:14 61:6
agreeable 69:6
agreed 30:7 37:14 49:17 52:24 53:3 66:10 94:21
agreeing 87:17
agreement 4:9,13 9:16 10:6,15 11:1,24 12:10 12:24 13:3,7,10,15 14:19 15:1,4,6,24 16:21 18:11,12,14 19:4,13 20:12 21:14 21:15 23:9 26:16 33:9

35:1,10,14 36:1,2,8 37:14,17,23 38:7,10 38:22 40:2,5,5,6 43:2 43:4,19,20,23 44:13 44:19,21 45:11,22 46:11 47:22 53:14 54:17 55:17 56:8,11 56:15 58:13,13 61:10 66:2 70:1,6 72:24 76:2 76:4,7,11 78:13 79:15 79:16 80:12,24 81:24 82:24 90:8 93:4,6 95:17 96:24 101:4 103:10 104:19
agreements 36:22,24 91:22 98:16 103:11 104:11,20
agrees 48:2
ahead 5:2 6:2 23:24 27:5 41:21 42:2 43:6 44:23 60:5 65:14 70:9 71:14 84:4 87:10 100:16
Aiken 2:13,14 4:4 6:17 7:14 68:17,13,21,22 70:13 71:19 74:12 79:15 83:22 84:7 87:14,23 89:7,13 90:3 91:8,14,24 92:7 93:12 93:25 94:12 97:2 98:15 99:16 100:3,11 100:22 102:6,15,24 103:7,18 104:5,15,23 105:2,7
at 1:6 107:2
Alfonso 2:4 8:9,10
ALN 108:25
ambassador 29:4
amended 4:18 14:9,11
amendment 10:16 12:24 13:3
amendments 13:7,13
amount 85:7
Ana 2:4 8:9
Andrea 1:23 3:23 109:5 109:19
Andrew 4:11
Angell 1:11 3:2,21 4:2,8 4:13 5:7,10,14,19,23 6:11,24,25 7:4,11,17 7:18 8:13 10:6,9,15,24 10:25 11:11,14,23,24 12:1,7,15,23 13:4,7,14 14:14,25 15:20,24

16:5,5 21:6,10,14,19 21:20,25 22:1,15,16 22:19,22 23:3,12,19 24:3,15,18,19,20 26:2 27:12 33:8 34:17,18 34:23 37:14 39:1 40:5 43:4,23 44:13 46:11 46:12 47:22 53:14 55:7 56:19 59:4 63:21 65:3 66:2 68:22 69:25 70:6 72:24 76:2,7,11 79:15 80:11,23 81:20 81:24 82:24 83:9 93:15 94:2 96:16 99:6 101:23 103:8,10 104:17,18 107:3
Angell's 6:19 11:6 14:3
annual 41:6,15 54:22 55:10
answer 11:6 24:8,12,13 38:14 39:6 41:18 42:2 42:3,17 44:23 46:8,23 51:15 52:5 57:24 60:17,18 61:12,14,23 61:25 64:21 71:3 72:13 74:14 82:3 87:11 93:4,23 94:13 94:14,17 97:13 99:23 103:22 104:3,6,24
answered 27:21,24 44:23 52:5 88:24
answering 39:7 44:4
answers 69:5 95:9 96:18
anybody 83:9 98:24
anyway 93:8
Apparently 20:14
appear 7:5
APPEARANCE 2:1 3:1
appears 109:7
appreciate 7:5 11:22 14:4 107:9
appropriate 85:13
approval 67:1 91:6 96:10,11
approve 48:3 49:20,25 50:5 51:18 67:5,5 80:2
approved 30:4 45:14 46:24 50:13,15,18,19 50:20 52:1,1 53:11 71:18 73:21 97:12,15
approves 51:24
approving 51:1 97:17
approximately 15:9 69:19
arising

16:5,5 21:6,10,14,19

85:2 102:17
article 15:22
asked 15:12,15 16:1,15 16:15 26:8 27:2 44:22 52:4,23 61:15,17 64:5 78:18 95:10
asking 9:5 39:11 40:14 41:12 44:18 50:11,12 58:11 92:8,8 103:19 104:21
assets 37:9 38:25 40:10 77:14 79:5,6,7,9 81:17 81:25 82:25 86:2,3 90:2
assigning 82:11
assignment 30:8
assist 107:11
assistant 49:5
assisting 8:10
associate 8:18
Associates 9:20 10:8 12:1 14:23 15:18 18:14 22:11,17 26:20 45:5,12 47:4,10 49:7,9 87:16 88:13,17 100:24
association 32:20 33:23 67:21 69:9
assume 11:13 19:14 20:7 28:19 48:2 51:19 52:24
assumed 50:6
assuming 46:18 50:8,9 50:13,15 62:6 102:16
assumption 28:21
attach 107:14
attached 42:7,11 81:24 82:24
attachment 45:2
attempt 93:4
attended 79:13
attention 107:9
attorney 35:11,20 38:5 48:11 49:10,11 56:22 57:4 58:23 81:15 102:5 109:15
attorneys 92:6 103:5
attorney/client 14:2 103:14,20
auditor 27:19
Austin 18:18
authority 44:10 97:16
authorizing 99:4
available 60:3,11,13,22 60:23,25 61:7,8
Avenue

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

111

2:6 3:15
aware 12:25 13:11
  92:24 98:17 99:18
  100:4,12,23
awhile 70:17
A-u-s-t-i-n 18:19

_____ B _____
B 4:17 10:18 12:18
back 15:4 18:5 23:1
  24:8 27:7 28:8 43:9,9
  46:8 47:8,25 50:1
  54:16 61:18,22 67:1
  71:3 77:17,18 90:22
  95:5
bank 33:2 58:7,14 77:19
bankruptcy 1:1 68:24
  82:13 90:11,22 97:22
  98:2 101:24 102:3,5,9
  102:23 103:5
barred 100:24
Barrow-Bosshart 3:13
  8:5
based 14:2 20:18,21
  74:15
basic 16:11
basically 15:7,9,22,25
  16:1 17:17 31:5 36:22
  55:25 64:14 67:2,4
  72:14 81:16 84:19,25
  85:24 93:7 94:19
  101:4
basis 14:1 28:21 31:19
beginning 66:22
begun 6:11
behalf 18:14 21:18,19
  21:22 22:11 24:18,19
  24:20 34:16,17 36:12
  37:23 44:16 54:1
  56:24 57:2 59:4 86:25
  88:9
believe 10:25 11:23 12:8
  38:4 39:14 42:21
  69:10 70:2 71:1 72:13
  76:20,22 101:19,20
Bell 18:20
Bermuda 63:9,10
Bernie 16:16 26:24 28:5
  30:5
best 56:11 66:9 86:4
  93:5 109:10
better 34:5 37:20 39:14
big 75:12
bill 72:11
billion 37:8 38:24 40:22

57:14,19 59:16 62:4
  73:16 75:15 85:22
  86:1 90:17 96:12
bit 88:11
blame 88:6,7,8
Blanco 48:11
Blass 11:16
Bogen 4:11
bolts 13:21
book 84:25 91:23
Booth 2:12 5:10,14,18
  5:24 6:22 11:8 16:25
  18:2 28:1,2 30:20 31:8
  32:7,10,18,19 33:13
  33:22 34:3 37:6 38:24
  40:17 43:1,8 44:1,5,5
  44:11,19,20 45:1,6,21
  46:19,20,24 48:4
  49:13,23 52:13,17
  53:2,7 54:3 66:9,23
  67:10 68:7,20,23
  71:16 72:15,22 73:22
  76:13,15,16 77:6,12
  77:17,22 78:24 79:13
  81:5,9,23 82:19,23
  90:14 96:6,7,10,11
  97:3,6,9
Booth's 49:21 53:3 80:3
borrow 101:13,13
borrowed 37:8 38:24
borrower 85:5,15 88:12
  88:16,16 94:22 101:6
boss 96:8
bottom 43:24 46:13,25
box 48:6
breach 85:4
breaches 95:16
break 46:2 88:11 105:9
BRENT 3:4
Brewster 18:20
BRIAN 3:19
brief 46:6 68:14 105:10
briefly 66:22 71:6
bring 24:5
brought 24:6 40:6
building 17:22 62:22
buildings 17:16 22:24
  23:1 33:4 77:21 86:8
  86:11
bump 68:5
business 47:9,13 52:10
  60:25 62:12,13,23,25
  63:16 65:6,8
buy

31:23 79:7 86:7,11
buyer 36:11 55:6 56:19
  73:6
B-e-l-l 18:20

_____ C _____
C 2:11 5:1 68:20
California 31:17
call 27:15 37:18 51:4,6
  51:10,13 53:11 64:19
  64:20 69:13 71:21,24
  72:21 73:2 74:17,20
  86:1 89:24
called 51:9,17 73:13
  74:9
calls 78:2
capital 16:7
capitalize 31:24
care 21:11,20 22:16,22
  23:3,12,19 24:3,20
  40:11 62:15 85:25
  107:5
carefully 56:18
Carolina 1:12 3:7,23
  6:10,14,22 20:21,22
  20:25 28:4 33:1 37:20
  63:3 68:25 77:15
  81:17 102:8,19 109:3
  109:22
carrying 7:22
carryover 25:19
Case 1:5
cash 44:12 52:19 77:10
  78:25
categories 9:10
cause 9:6
ceased 106:5
Center 9:19 14:22 26:19
centered 79:8
CEO 10:1
certain 8:17 44:16 48:7
  65:23,25 66:3
certainly 61:4
certificate 4:16 12:17,21
  13:6 98:22,23,25 99:4
  109:1
certification 10:14
certify 109:7
CFO 16:19 17:15 50:1
  72:17
chain 97:15
chairman 10:1 15:14
change 38:5 40:9
changes 37:1 54:12
  107:5

changing 54:3
Chapter 1:4
charge 7:21 27:18 66:23
  72:16
check 54:6
chief 45:10 49:24
circumstances 5:22
Citibank 62:5 73:17
  82:11 90:18,20 101:17
  101:21
Citicorp 33:5
Citicorp's 85:22
city 63:2,18
claim 94:4 101:23 102:9
  102:17 103:1 105:3
clarification 13:19
clarify 12:23 23:6
Clary 2:14
clear 6:18 27:13
Clemmons 20:22 28:4
client 96:25 97:17
clients 96:4,5
close 28:1 53:10 75:6
  85:18
closed 22:24 76:12
  80:13
closely 86:8
closing 45:9 50:20 52:13
  80:24 86:25 90:13
coffee 34:8,11
collateral 15:11,12,16
  15:17 16:2 17:19,20
  17:24
colleagues 7:10 8:9,9
Collins 48:12
come 10:2 22:21 28:5
  36:23 97:21
comfort 103:10
comfortable 36:19
coming 45:1 60:24
command 97:15
comment 6:7 13:20
comments 5:3 6:15
commission 55:15
  106:14 109:25
Committee 3:11
communicated 30:5
communication 26:15
  29:20
communications 5:9,13
  5:19,23 16:18 22:5
  24:23 44:19
community 72:8
companies 54:23 64:11

64:14,18
company 22:23 24:6
  36:17 37:4 40:7 44:10
  45:10 60:3 63:4,5,12
  75:10,14,16 76:19
company's 58:17 87:17
complaint 4:18 14:9,12
  21:6,10,24
complete 23:17 55:7
  56:20
completeness 11:5
concern 77:8
concerning 21:14,15
  22:6 43:2 77:6 91:17
  92:22 93:16 94:6 99:9
  99:19 102:9
conditions 76:3,6 99:9
  104:11
conference 1:11 2:2,11
  3:11,21 7:9,12,15
  69:14 70:18 72:7
  79:24
confirmation 7:21
conflict 103:11 104:10
  104:19
conflicting 36:21,24
connection 17:10 19:3
  24:22 25:16 35:14
  41:6,15 47:17 48:14
  55:10 58:20 65:22
  66:2 68:24 83:10
  98:10,11,20 105:5
consecutively 46:15
considered 19:6 105:3
consultants 36:7
consulted 17:9
contact 44:5 78:1
contain 9:2 91:17 92:1
contained 41:25 42:23
  59:10 76:7 98:17
  99:11,19
contains 11:17 42:14,19
  98:9 100:5
CONTENTS 4:1
continuation 81:13
continue 45:15,24 46:5
  63:21
Continued 3:1 105:15
continuing 78:14
contracts 31:13,14,16
  31:18
control 5:9,12 14:3
controller 49:24
controlling 19:11
convenient

46:3
conversation 20:17
  51:18,21 52:3 66:25
  67:2,3 71:9,17 72:15
  73:4,23 74:4 75:7,22
  80:4
conversations 17:13
  19:2 20:15 52:12 81:8
  81:12,18,22 103:24
convert 16:5 29:2 79:1,4
  81:17
converting 77:14 79:9
  81:25 82:25
copies 56:20
copy 55:8
corners 96:16,22
Corp 10:4 25:13,13
corporate 9:24 10:17,19
  25:14 26:12 27:20
  88:9,23 94:22
corporation 23:4,7
  86:12
correct 11:18 13:6
  14:24 19:7,14 20:5,25
  21:1,4 22:2,3,12,13
  23:8,22 26:6,9,10 27:4
  27:10 28:18 29:7,19
  30:13 33:10 35:8
  42:21,24,25 47:15
  48:18,19 49:8,12
  51:24 53:4,6 54:9,10
  54:20 55:7 56:20,25
  57:3,4,6,7 60:14 66:11
  66:12,16 67:8,25 68:3
  69:11,15,17 70:4
  78:22 79:11 80:20
  81:21 83:2,3 86:23
  88:13,17,21,22 89:18
  90:25 98:4
corrections 107:5,12
cost 23:16
counsel 1:12 2:1 3:1,22
  7:2,12,24 8:7 35:15
  68:19 93:25 103:9,16
  104:9,18,21 105:4
  109:12,15
counterclaim 85:2 95:15
counts 54:7
County 78:9 109:4
couple 8:8 32:19 72:3
course 6:8,11 7:8,16
  66:24 68:6
court 1:1,24 3:24 6:4,23
  7:16 8:2 10:22 18:4

20:25 24:7 46:7 61:22
  78:9 98:2 102:3
  109:20
courtesy 51:10
covenants 40:8
cover 11:15
co-trustee 57:5
co-trustees 22:1 63:21
creditor 91:3
creditors 3:12 8:7 90:24
cumbersome 69:3
cup 34:8,11
cure 85:13
Curry 18:22
custody 5:8,12 14:3
cut 93:8
C-u-r-r-y 18:22
— — — — — — —
        D
D 5:1 21:24 22:19 34:23
Dallas 2:17 7:15
damages 102:17
damn 39:9 40:9 45:20
  64:13 90:22 96:22
Dan 37:6 49:3,15 76:13
  76:15,16,19,20 78:1,2
  78:11 81:9 82:5,16
Daniel 2:12 68:20
darn 74:6,8
date 28:12 44:15 45:9
  58:3 71:2,4,7,8
dated 4:10,12,13 5:5
  9:17,21 10:6,10,15
  11:1,19,24 12:10,17
  14:20 21:7 25:15
  26:17 33:9 43:4 44:9
  44:14 80:24 94:18
  98:25
dates 29:24 80:9
Dave 48:9,21,22,23
day 3:23 29:15 63:20
  76:11 77:18 80:11,12
  94:18 106:8
DC 67:10,17
deal 25:4 30:2,3,7,11
  31:4 32:23 53:9 58:21
  62:11 65:22 72:1
  73:25 74:21 76:1,8
  77:23 78:3,13 79:3
  90:13
dealing 21:17,21 22:9
dealt 20:19
death 22:21
debt 48:2 82:7 85:23
  89:1,2,5,8,9,10,20

93:13 94:7
Debtors 1:7
debts 92:23
December 42:20,24 55:9
  56:6
deed 33:3
deemed 57:10
default 85:12 89:1 95:16
  95:16 101:5
defaulted 33:6
defaults 85:4
defendants 6:21
defense 84:23 95:13
deferred 85:19 101:10
defined 88:17,20
defines 88:16
defunct 22:23
Delaware 1:2 97:22
department 9:24 42:7
deposition 1:11 3:21 5:4
  6:3,9 7:6,8,25 8:3,8
  11:7 37:10 57:22
  69:25 86:22 97:11
  106:5 107:3,4,7,8
  109:6,8,13
desires 31:20
deterioration 73:11
developed 6:13
development 9:24 10:5
  10:18,19 25:14 26:12
  27:21 42:6 88:9,24
difference 83:16
different 30:6 32:24
  52:15 74:5 103:4
diligence 59:24
direction 31:15 109:11
directly 25:12 27:21,24
  49:10 55:23 72:12
director 10:5
directs 8:17
disclosed 33:3 55:14
  58:9,16 62:14,16
discovery 6:10,14 65:18
discuss 52:16 57:9 75:13
  75:18 78:23
discussed 53:2 73:1
  74:19 78:17,18,19
  79:5,12 81:14 82:5
  103:15
discussing 75:21
discussion 82:15
discussions 21:13 43:2
  49:16 77:4 79:8
district 1:2 20:25
Docket

113

1:7
document 9:16 11:13,14
  11:24 13:1,3,8,10 14:5
  14:19 15:18 16:16,22
  16:24 17:1 19:12
  26:16 30:22,24 33:8
  37:14 41:2,2 43:7 44:8
  47:22 48:5 49:9 50:2
  56:13 57:15,18 64:1,6
  64:8 65:10 83:23,24
  88:12,14,16 89:2 90:9
  93:22 95:6 96:2,17,23
  96:23 97:3 99:24
  100:1,4,23,24
documentation 90:14
documents 5:8,12,16,18
  5:25 8:18,20,24 9:2,7
  9:9,10,13,14 10:22
  13:15,22 14:1,3 17:4
  36:14 37:6 39:5,10
  63:25 65:17 73:19,20
  73:24 74:1 75:25 78:6
  92:18,19 99:5,18
  100:8,13
doing 37:16 81:16 95:8
dollar 40:23 57:14,19
  58:13 62:4 73:14,16
  75:15 86:2 90:17
  96:12
dollars 37:8 38:24 59:16
  85:22
Don 1:11 3:2,21 4:2,8
  5:7 6:25 15:20 16:4
  17:17 21:6,19,25 22:1
  24:18,19 26:1 34:18
  35:6,13 44:23 45:15
  48:8 51:18 52:5 56:21
  61:12 74:9 77:18 87:2
  93:2 104:17 107:3
door 32:13 77:3 80:16
Dr 9:25 56:1 67:19 72:6
  75:9
Driggs 11:16
due 59:23 85:8
duly 6:25 109:8

_____ E _____
E 5:1,1 107:1,1,1
earlier 29:15 33:11,22
  77:11 81:14
early 69:21 70:5,21
  71:23
earnings 25:9
ear-balls 52:18
effect 56:3

effects 66:5
effort 102:17
eight 10:15 75:6 95:25
either 22:4 24:18 97:8
Elizabeth 4:17 10:12,18
  12:17 30:16 44:17
  77:1 88:8,22
Elkins 10:1,2 52:25 56:1
  62:8 67:19 72:6 75:9
Ellie 3:20 8:11,11
employed 109:12,15
employee 5:20 27:23
  109:15
employees 5:13 23:13
  23:15,18 24:3
ended 42:20,24 55:9
entered 13:14 57:20
entire 21:23 22:11 59:4
  67:24 76:2,3 91:4,17
  92:1
entities 8:17 17:5 21:2
  22:14
entitled 11:24 14:19
  26:16 33:8 43:3,23
  93:1,20
entity 7:21 21:8,11
  89:21
Ernie 30:5
errata 107:14
Esq 2:3,4,13 3:3,4,13
established 70:2
estimate 32:14
et 1:6 107:2
euphemistically 69:13
evasive 74:3
event 85:4,12 88:25
  101:5
evidenced 92:23 93:18
  94:7
evidencing 47:5
exact 28:11
exactly 71:24 78:3,12
examination 4:2 5:22
  7:2 65:1 68:19
examined 7:1
exceeded 56:2
Exchange 55:14,15
exclusively 16:23
excuse 27:24 38:8 44:3
  50:24 57:1 62:24
  74:24 78:17 98:1
  101:3
execute 17:6 97:9
executed 15:5 18:13

41:2 44:21 55:18 61:9
executive 10:12,18 88:8
  88:22,23
exhibit 6:2,5 8:3,14,16
  11:3,4,10,13,20,21
  12:2,4,6,11,12,14,18
  12:19,21 14:9,10,12
  14:15,18 17:2,6,10,14
  19:17,20 21:16 22:6
  23:10,21,21,21 24:11
  24:16,23 25:6,10,11
  25:16,19,20,21,24
  26:2,8,11,14 27:10
  28:12 30:25 31:1,2,3,5
  34:14,16 35:15 37:24
  40:8 42:11,12,13,13
  42:19 43:3,9,18,20,23
  44:14 45:23 46:11,13
  47:3,21,25 53:13
  69:25 79:16 81:25
  82:24 84:8,10,11
  86:21 91:16,25 92:25
  93:7,19 94:3 96:3
  97:10 98:8,17 99:11
  99:21 100:5,10,20
EXHIBITS 4:5
exist 9:3
existing 101:7
exists 85:16
expiration 85:13 101:5
expires 106:14 109:25
explain 71:23 90:9 93:3
explained 17:17
expresses 96:3
expressly 95:20
extent 6:12 9:2 55:3
  88:3

_____ F _____
F 37:20
face 30:12,12,15,15
  39:19,19 70:7,7
fact 22:8 23:16 29:25
  62:9 67:9,19 73:12
  78:4 82:5,12,14 83:1
  83:14 90:12 97:19,20
facts 5:22
failure 85:6
fair 78:22 81:20
fall 9:10,13 69:20 70:5
  70:21 71:22 72:23
  75:23
falls 104:1
familiar 21:8,11 54:19
  54:25 55:2 102:22

Family 34:18
far 35:4 78:15 81:16
fax 4:11 11:19 49:1
faxed 50:2,3
Faye 49:2,4
February 5:11 9:17 11:2
  14:20 23:11 26:17
  28:17,18,22
federal 20:24
fee 31:18 85:14,17 101:6
  101:9
feel 73:11 94:15
feeling 86:18
fell 13:22 63:25 65:17
  72:10 86:17
felt 36:18,19 67:11
field 27:19 105:1
file 101:23
filed 55:14 102:3,4,4,8
  102:25
files 65:16
filing 105:3
filings 83:12
finalized 28:13,14
finally 5:17 6:6 77:17
  78:1
financial 28:2 32:21
  36:7,17 41:24 42:4,10
  49:24 50:5,6,10,12
  59:7,10,14 60:1,2,7,13
  61:4,7,9 62:3 65:21
  66:1,4 67:18,23 74:7
  75:13
financially 109:16
financials 42:8
find 9:9,13 15:22,23
  42:7 43:10 92:18
  107:5
fine 51:19 57:13 68:13
  68:13 73:5
finish 23:15 24:2 60:16
  64:12 69:4,5 71:14
  97:8
finished 38:13 60:18
  68:18 71:13
firm 8:6 35:21,22,23,25
  48:13
firm's 7:15
first 6:25 10:25 11:15
  16:20 45:11 46:13
  69:18 70:22 71:10
  88:15 89:17,19,25
  90:1 101:14
fiscal 55:8
Fishman

16:17 26:24 27:17,18
28:5,17 29:5,9,14,18
29:21 30:1,13,20 31:8
32:4,18 33:12 38:16
38:23 39:2 40:17
66:24 71:16 72:14
77:2
fit 72:10
five 18:10 19:24 46:5
85:9,11 86:18,20,23
87:4,4,6,15 91:16,25
92:15,25 93:19 94:3
101:14,19,20 103:4
Florida 20:18
flow 44:12 52:19
focus 24:11
FOLLAS 3:19
follow 83:18 87:12
followed 54:23
following 105:15
follows 7:1 15:7 85:4
foregoing 109:6,8
form 33:16 35:16 42:1
46:21 55:8 83:21 84:3
87:9,10 94:1,9 107:12
former 16:13
Forsyth 78:9
forth 8:19,20,20 9:11,14
76:2
forward 18:3 31:12 66:6
found 9:16,21 10:6,13
82:8 90:12
four 36:13 40:16 47:13
55:20 96:16,21
frame 23:11 76:13 80:21
80:23 81:12
fraud 37:19 83:10 94:15
free 94:15
frequently 81:10
FS 46:25
fucking 40:13
full 90:16 96:12
furnish 107:14
furnished 55:6 56:19
further 105:14 109:14
future 29:3 52:9 84:17

_____ G _____
G 1:11 3:2,21 4:2,8 5:1
6:25 26:1 34:18
104:17 107:3
generally 54:25 67:25
68:3
gentlemen 86:6
George 48:7

getting 62:8 81:9
give 10:21 15:12,15 16:2
16:15 17:2,18,22 20:2
28:11 29:24 30:8,8,10
40:8 64:19 65:12
84:14 90:14 94:10,17
95:8 103:9
given 15:11 47:20
glad 46:22
go 5:2 6:2 27:5 30:2,11
36:25 37:18 41:21
42:1 43:5,8,9 44:23
51:12 53:10 60:5
65:14 67:1 70:9 71:14
84:3,5,19 85:3 87:9
94:19,24 95:5,17,19
99:13 100:16
goes 77:25
going 17:25 18:3 23:24
31:10,12 37:9,18
38:25 40:9,10 42:16
46:1 47:25 50:6 51:8
51:11,15 52:20,25
68:16 69:4 73:5,6
75:10 77:17 78:8
94:14 96:13,19,22,23
99:13 102:22 103:21
105:13
good 7:4 13:20
gotten 14:6 73:16
Gray 21:24 22:19 34:23
74:21 75:10
greater 92:16
group 10:9 12:2 15:8
16:5 21:23 22:11
53:15 55:7 56:19
58:14 59:5 66:25
growth 31:11
guaranteed 79:2 84:1
96:4
guaranteeing 95:24
96:25 99:20
guarantees 84:16 95:1
guarantor 83:17 84:15
84:17,22 85:5,7,15
88:18,21 95:24 101:7
guaranty 4:15 10:9,11
12:8,9,10,13 15:16
16:11,13 84:12,15
86:20 91:16 92:1 93:1
93:8,9,20 94:4,18,21
94:25,25 95:4,11,20
95:21,25 97:9 98:7,10

99:10 100:6 102:10
104:10
guns 75:11

_____ H _____
H 107:1
hand 6:4 46:16 53:16
handle 67:12
hands 49:16
handwriting 43:24
54:14
handwritten 46:14
54:11
happening 68:5
happy 39:15 72:9
hard 79:9 81:25 82:25
Hart 53:11
Hartley 53:12
hat 100:18
hate 74:3
Hawthorn 9:19 14:22
26:19
head 32:12 77:2 80:16
health 1:5 11:25 12:16
14:21,21 26:18,18
31:11 72:8 73:15
88:20 107:2
healthcare 9:18,19,23
10:4,7,13,17 16:3,8,12
17:21 25:12,13 26:13
28:25 37:7,12 40:18
41:10 49:18 52:9
62:12 64:11,14,17
67:19,25 68:3 82:8
85:24 86:11 88:1,10
88:19
Healthcare's 27:20
hear 69:22 70:14
heard 69:18 70:22 71:10
74:11 97:21
heart 86:17
held 41:6,15 55:10,11
hello 32:13 77:3 80:18
HELMS 3:4
hereunder 85:8
Herzog 15:13 17:19
19:10,12,19 20:11,16
20:18,19
Herzog's 19:25
Hi 68:22
hit 37:11
hold 19:18 57:23 84:9
Hollodick 48:7,10,16
home 15:8 37:11 40:18
62:12,20 63:7,13

64:17 65:6 73:15
honest 40:25
honestly 79:25 103:6
honesty 37:4
Horizon 41:9 75:11
hotel 7:13
hour 32:16 33:14 46:2
House 21:25 22:18 35:6
35:13,20,24 37:22
38:3,3 48:8,18 56:21
56:22,24 57:2,8 59:7,9
59:15 63:15,20 65:9
65:16,20 87:2 88:6,7
Houston 3:14 8:6
Hutchins 48:9,21 49:2,3
49:4

_____ I _____
idea 53:19 63:1 102:4
identification 6:5 11:4
11:21 12:6,12,19
14:10
identified 70:25 81:1
identifying 81:9
IHS 1:12 2:2 3:22 4:6
5:20 7:2,20,23 20:12
47:14,18 48:15 55:20
57:20 61:8 65:21
68:24 69:19 70:22
71:11 76:4 82:1 83:1
83:10,17 84:1 86:25
87:4 88:5 89:3,10,21
90:1 91:4 92:22 94:7
96:6 98:9 99:19 100:5
102:9,10,13 103:12
104:11,18,20,22 105:5
IHS's 90:19
immediate 9:23
impairment 95:22
important 16:10 30:1
36:14,19 85:9 93:23
impose 10:21
included 13:12 15:20
including 78:24 79:18
incorporate 6:3
incurs 85:24
indebtedness 85:14,17
85:20 87:7,18 88:5
93:17 94:6 101:6,9,11
INDEX 4:5
indicated 7:24 31:10
44:15,17
individual 21:18 24:17
48:24,25 65:20
individually 24:18

115

individuals 22:4 33:19
    48:21 49:18
industry 67:25 68:3
information 6:13 26:11
    57:9,10 59:10 60:3,10
    60:14,21,23 61:8,9
    64:12
informed 26:12
infrastructure 97:21
Ingersoll 35:24
initiated 51:4
Inn 3:22
instant 106:5
instruct 104:2
instruction 104:13
instrument 21:7
Integrated 1:5 9:18,18
    9:23 10:4,7,13,16
    11:25 12:16 14:20,21
    15:15 16:3,8,12 17:21
    18:1 25:9,12,13 26:13
    26:18,18 27:20 28:25
    31:11 37:7 40:6 49:18
    49:19 55:23 78:23
    79:2,3,7,10,17 82:7
    85:23 86:11,14 87:21
    87:25 88:2,10,18,20
    99:7 107:2
Integrated's 79:5,6
    99:10
integrity 37:4 40:7
intelligent 38:4
interest 15:3,6 43:11
    85:16 101:8
interested 109:17
internal 65:25 66:3
Internet 59:25
interpretation 88:4
interrupting 60:16
invests 64:10,15,17
involved 23:20 24:17
    34:25 35:9,25 36:7,16
    37:22,22 43:1 59:18
    59:23 66:1 67:13 72:8
involvement 35:3 48:13
    66:7
involving 24:23
Irrevocable 21:7,19
    22:1 24:19 34:19
issued 41:14 55:19
    56:17 94:21
item 10:25

_____ J _____

J 2:12 68:20

January 5:10 55:16
Jenette 3:13 8:4
Jewel 18:18
job 71:6
John 3:3 15:24 51:16
    68:11,15 105:11
joint 84:16
jointly 1:6 95:2
joke 40:13
Jr 3:3 18:20 21:25 22:19
    34:23
jtaylor@robinson-la...
    3:9
Judge 5:4,5 104:2
July 21:7
jump 24:14
jumping 23:24
June 10:10 12:10,17
    41:6,15 45:9 55:11
    76:12,21 79:18,22
    80:7,13,25 81:7,22
    82:22 83:6 87:1 94:19
    98:3,25

_____ K _____

Kaye 2:5 7:11,19,19
keep 72:2 96:22
Kelly 4:17 10:3,12,18
    12:18 16:16,17,23
    18:2 19:19 25:8,11
    26:12 27:16,23,25
    29:4 30:7,16 31:8,9
    32:5,18 33:12 38:12
    38:15,18,21 39:2,13
    39:20 40:1,3,17 42:6
    43:8 44:17 52:1 61:2
    62:8 66:24 71:16
    72:15 77:1,12 88:8,23
    90:15 96:7 97:4,5,16
    98:25
Kelly's 16:19 71:5 73:21
    80:2 96:8
key 30:2
kind 13:2
KIRSCHENBAUM 4:3
Kirschenbaum 2:3 6:23
    7:3 10:20 11:9,12,22
    12:7,15,22 13:9,18
    14:4,13,17 18:4,8
    19:22 24:7,10 26:5,25
    27:7,11 28:8,15 32:9
    33:17 34:22 35:19
    36:5 38:17 41:23 42:9
    43:13,22 45:3 46:4,7
    46:10 47:2,24 52:11

53:25 56:4 58:4 59:17
    59:22 60:9 61:5,14,18
    61:21 62:17 64:23
    65:2,5,13,15 68:11,15
    69:9 105:8,11,13
knew 5:19 19:1 25:20
    31:10 37:16 73:18
    74:6,8 78:2,3,12 82:12
    86:15
Knollwood 3:6
know 7:18 15:23 18:24
    24:14 28:14,23 29:12
    33:2,5 34:5 36:10
    40:15 41:19 44:25
    45:17 46:17,18 48:24
    49:14,22 50:9,17
    51:22 52:7,10,24
    53:10,19,23,24 54:1,4
    54:5,6 57:25 58:1,2,16
    60:24 63:17 64:13
    65:10 70:16 73:17
    74:10,15,18 75:5,12
    76:22 77:22 79:20
    82:2 83:9,13 86:17
    90:10,21 92:9 93:15
    97:17,18,19,20,24
    98:5 99:3,24 100:1
    102:2,13,21,25 103:6
    104:24,25
knowing 37:8 38:25
    40:9 51:11 56:15
    90:16 96:12
knowledge 22:5,7 26:22
    33:21 36:15 42:2
    58:12,15 76:9 79:14
known 37:20 40:21,22
    86:7
knows 73:17

_____ L _____

L 1:23 3:23 10:12 109:5
    109:19
labeled 13:3 45:23
language 88:3 91:17
    92:1,9,14,24 93:16,19
    100:23
large 53:15 67:24
lasted 32:15 33:13
late 69:20 70:5,21 71:22
    72:23 74:18 75:23
    78:1
Lawing 3:5
lawsuit 68:25 102:19
lawyer 60:12 61:6
lease 31:23 32:1,2,2

79:6
leases 15:8,17 17:23
    30:10 31:25 86:10
legal 87:2 104:9,16,17
Leighton 2:13 68:22
lender 84:16 95:1,21
length 49:15
Les 6:6 46:1
LESTER 2:3
letterhead 11:16
letters 24:24 25:3,5
let's 12:11,18 17:1 24:2
    24:11 33:7 46:4,5,11
    64:25 83:14 86:19
    88:11 96:17 105:8
liability 95:23
liable 51:11
lied 37:15
lien 17:22,22,24 77:19
    77:20,21 86:13
liens 79:4
life 86:7 91:6
limb 99:14
limitations 15:21 95:5
    95:22
Limited 34:18
limits 5:21
line 11:19 48:7 107:6,16
    107:18,20,22,24 108:1
    108:3,5,7,9,11,13,15
    108:17,19,21,23
Liquidating 1:12 2:2
    3:22 4:6 7:2,20
liquidation 7:23,23
list 9:2 107:6
listed 21:25
listen 24:15 85:18 86:8
lists 21:6,10
litigation 20:24 21:4
    39:12
little 33:2,7 69:3 78:15
    88:11
live 74:1
LLC 1:12 2:2 3:22 4:6
    7:2,20
LLP 2:5
loan 40:23 57:14,19
    58:7,12,13 62:5 73:16
    85:6 86:2 90:17 95:6
    96:12
long 15:9 16:2 23:15
    29:11 32:14 34:3 54:6
    67:18 98:2
look 9:6 14:15 25:10

31:2 36:10 37:3 45:11
57:17,21 69:24 88:15
95:5
looked 60:1
looking 36:1 72:20 82:9
looks 32:1
lot 59:7 64:11 82:15
91:2
L.L.P 2:14 3:5

— — — — M — — — —
main 3:22 36:12
majority 19:7
maker 83:25
making 52:18 107:11
man 32:21 45:1 51:17
72:16
manage 31:23
management 31:12,14
31:16,18 32:1
March 1:13 3:23 5:5
9:21 10:7,15 11:19,25
23:12 25:8,15,15 31:6
31:7 33:9,14,19,25
39:25 42:5 43:4 44:9
44:14 45:19,19 50:2
55:18,24 58:5,8,14
60:11,14 68:9 70:2,6
70:18,23 71:11,23
72:24 76:11,21 79:21
80:6,12,24 81:7,21
82:22 83:6
mark 6:2 10:23 11:19
12:4,11,18 14:5
marked 6:5 8:1,3,14
11:2,4,12,21 12:2,6,12
12:14,19,21 14:9,10
14:12 17:2 21:15,16
23:10 35:15 37:23
38:11 43:3 79:16
86:21 91:16 97:10
98:8
marking 10:22
Maryland 30:19 32:4
material 16:13 37:1
38:5 59:9
materials 59:7
matter 13:16 39:4 82:5
82:14 107:10
matters 103:15
mean 6:20 27:24 34:6
38:18 51:16 61:2 72:2
74:3 96:5
meaning 6:21 93:3
104:17

means 84:25 85:1 91:2
92:12
MECKLENBURG
109:4
meet 29:8 34:3,10 76:13
79:22
meeting 29:5,11,17,21
30:12,15 32:3,11,15
32:20 33:11,22,23
34:2 41:6,15 55:10,11
67:10,19,22,23,24
68:2,6,8 69:9 70:7,11
70:12,18 77:5 78:16
78:19 79:12 80:7,14
80:16 81:6
meetings 32:17 33:18
39:19
member 56:23
members 55:7 56:19,21
59:2
mention 32:8
mentioned 11:1 15:19
75:25 77:11
merged 47:14
merger 4:9 9:17 11:1
14:19 15:25 21:16
23:10 26:17 47:17
48:14
merit 40:7
met 29:15,16 31:4,7
32:19,23 34:7,7,12,12
76:16,19,20 77:1 98:1
98:5
Metamoris 48:12
middle 48:6 52:17
Mill 30:19 32:4 76:16,17
76:17,18 78:16,23
79:13 81:6
million 73:14
millions 90:24
mind 40:10 72:2
minority 18:19,20,23
19:3
minute 23:3 27:1 57:23
82:4 105:8
minutes 29:12 33:13
46:5 68:12 94:11,17
misleading 60:7
misrepresentations
83:11
misunderstood 66:4
modification 95:22
moment 84:14
money 78:7,10 89:12
month

15:10 31:7 39:24
77:24
months 42:24,25
Motion 4:7
Muenchow 18:21
multiple 19:21
multi-billion 58:13
multi-page 11:14,24
14:18
multi-party 16:21
M-u-e-n-c-h-o-w 18:21

— — — — N — — — —
N 3:3 5:1 9:25
name 21:5 25:23 26:3
35:23 48:24,25 63:4
63:12 68:22 80:3
national 32:20
nature 23:16 36:25
71:24 81:11 95:6
Nd 16:21
necessary 107:13
need 20:3 40:14 71:17
74:10,15,18 92:20
94:13,15 103:14
needed 53:5
needs 48:3 97:7 98:24
negotiate 38:7,22 46:20
46:23
negotiated 34:16 46:19
negotiating 34:25 35:9
35:14 36:2,8 37:23
38:10 52:18 65:22
66:2 73:9
negotiation 35:5
negotiations 16:20,25
39:1,16 40:1,24 44:20
59:19
negotiator 59:4,6
neither 109:11
net 59:16 85:2
never 33:3 60:7,25
62:16 73:12 74:10
82:12
new 2:7,7 3:16,16 7:11
24:6 72:7 91:11
news 9:21,25
NIC 69:14 70:11,17
79:23
nice 61:21 67:18
Nobrega 1:23 3:23
109:5,19
non-privileged 5:8
North 1:12 2:16 3:7,23
6:10,14,22 20:21,22

20:25 28:4 32:25
37:20 63:3 68:25
77:15 81:17 102:8,19
109:3,21
Notary 1:25 3:23 106:22
109:20
note 8:4 15:9 16:2 26:21
29:2 32:25 36:24 43:5
43:10 46:14 55:21
61:16,25 77:14 83:20
86:16 93:2 94:9
noted 12:15
notes 47:4 66:11 79:1,4
79:9 81:17,25 82:6,6
82:11,15,25 83:1,14
83:16,17,24 84:2 85:6
85:21,23 86:3 87:8,18
88:5 90:4,10,15,18
91:5,19 92:3,23 93:14
93:18 94:8 98:11,12
98:21 99:8,20 100:7
101:25 102:18,18
notice 21:24 85:13
95:20 101:5
November 78:11
number 16:1 36:13
53:14 56:2 64:20,24
65:2,6,7 72:5 77:9
85:10,11 86:18 91:23
95:19 107:6
numbered 46:16,17
numbers 42:20,22,23
53:15,18 54:4
nursing 9:19 14:22 15:8
26:19 62:20 63:7,13
nuts 13:21

— — — — O — — — —
O 5:1
oath 75:3,5 92:21 99:2
object 33:16 42:1 46:21
74:13 87:9 94:1
103:13,25
objected 87:10
objecting 100:15
objection 25:25 26:21
27:5 32:6 34:20 35:16
36:3 43:5 44:22 47:19
52:4 53:22 55:21
59:12,20 60:5 61:11
61:16,25 70:9 73:3
83:20 84:3 87:19 89:4
89:11,22 91:1,20 92:4
93:2,21 94:9 96:20
98:13 99:12,22 100:9

117

100:14 102:1,11,20
103:3,13,21,25 104:12
obligation 84:21,22
85:18 95:7,11 101:6,9
obligations 85:14 98:9
98:17 99:7,10,19
100:5 101:25 102:10
occasion 9:5
occasions 30:6 32:24
77:23
October 55:12
offer 29:1
office 28:3,6,24 29:6,22
36:9 76:23,24 107:8
officer 10:14 45:6,7,8,10
49:24 50:1,5,7,10,12
75:10 109:5
officers 18:3 78:24
officer's 4:16 12:16,20
13:6 98:23,24 99:4
offices 7:11 22:10
official 3:11 75:9
offset 84:24
Off-the-record 46:6
68:14 105:10
oh 77:21
okay 9:6 11:9 13:9 14:4
17:1 18:13 24:1 26:14
32:10 34:15 39:1
42:17 54:18 71:20
76:19 84:11,14 98:3
100:12 103:17
omissions 83:11
once 79:3
operate 63:2,15
operates 62:22
opine 103:9
opinion 85:9 96:3 104:9
opinions 103:8 104:16
104:17
opportunity 17:3
option 16:6
order 4:7 5:3,5,7,21 6:2
7:25,25 8:2,13,16,19
8:23 9:1 10:23 13:23
24:5 65:18 86:10
104:2
organization 54:2
original 107:4
Otterbourg 3:14 8:6
outcome 109:17
outline 18:12 25:3
outlined 31:19
outstanding 94:22
owed

51:7 77:14 89:3,6
89:10,12,15,20
Owens 2:14
Owings 30:19 32:4
76:16,17,17,18 78:16
78:23 79:13 81:6
owned 17:25 32:25
77:15 79:9 82:1,25
owner 18:19,21
owners 16:14

——————— P ———————

P 5:1
package 13:1,12
page 4:6 8:24 11:15 16:4
19:16,21 43:15,16,24
45:11 46:13,14,15,16
47:3 48:5,6 53:13
54:17 57:21 84:20
86:23 101:15 105:15
107:6,16,18,20,22,24
108:1,3,5,7,9,11,13,15
108:17,19,21,23
pages 8:20 9:1,11,15
46:17 107:13
paid 72:5 85:7 86:1
89:17,20,25 90:1
paragraph 88:15 94:20
94:20 96:1
Park 2:6 3:15
part 47:20,22 76:8
83:25
participated 29:13
particular 8:22 16:22
53:2 66:14 81:18 93:7
particularly 36:12
89:23 100:20
parties 18:10,17 109:13
109:16
partner 8:5
Partnership 34:18
party 14:25 25:20,21,24
104:20
pass 105:7
passing 70:11
pattern 31:11
pay 50:6 78:4,7 85:7
96:25
payment 4:15 10:9,11
12:8,9,13 33:6 43:10
43:12 44:25 45:4,5,13
46:23,24 48:3 49:20
49:25 50:13 51:1,14
51:24 52:22,23 53:4
66:10 77:24 81:15,23

82:23 84:18 86:21
87:7,18 92:1 93:1,8,10
93:14,20 94:18,25
95:4,14 96:4 97:10
98:8,20 99:7,8,10,20
payments 45:24 54:8
84:12,15 93:17 94:4
98:10 100:6
Pearl 2:16
pending 20:24
people 18:24 44:16 66:1
91:13
percent 16:6 62:11
73:15
period 23:2 30:1 79:23
85:14
personal 26:23 27:9,15
86:9
personally 34:17 43:1
persons 68:2
perspective 22:8
pertain 13:15
pertaining 5:15 9:22
16:1,24 27:10
phone 30:5 51:3,4,13,17
52:2 73:2 81:8
pick 68:18 74:5
picked 51:13,17 73:12
Pickett 2:11 5:10,14,19
5:24 6:21 11:7 16:18
16:23 18:2 27:22,23
27:24 32:5,8,12 37:10
40:17 51:25 62:7
66:19,21,22 67:1,4,5,8
67:15 68:6,7,20,23
69:10 70:8,25 71:4,18
71:22 72:12,16,23
73:1,10,12 74:17 75:9
75:21 77:2 79:22 80:1
80:8,14 81:2 88:24
90:15 96:6,7,8 97:9,17
98:1 99:1,2
Pickett's 57:21 96:9
place 7:8 17:7 37:13
39:2,8,8,16 46:3 57:23
58:7,14 71:8 75:7
102:22
places 26:4
plaintiff 39:12,14
plaintiffs 20:23 21:3
98:11,21 99:20 100:6
101:25 102:8,18
plaintiff's 99:8
plan 4:9 7:23,23 9:17

11:1 14:19 21:16 23:9
26:16 28:2
play 22:21
please 12:10 18:5 21:5
24:8,15 28:8 31:1
34:14 39:6 61:18
64:12 107:4,12,14
pleased 56:13
pledge 37:9 40:10 90:2
96:13 101:20
pledged 33:4 82:6 83:2
83:15 84:2 85:25 86:2
90:5,6,8,10,12,15,18
90:19 91:7 101:16
pledging 83:16,16
100:25
point 10:1 13:18 29:3
68:16 72:7 92:20
100:19
portion 92:17
position 16:19 98:8
possibility 77:13
possibly 31:22 32:24
65:21 71:10
postponed 85:19 101:10
post-plan 7:20
potential 71:21 72:21
practices 35:20
precisely 44:18 74:25
preliminaries 14:7
Premiere 5:15 9:20 10:8
12:1 14:22 15:8,14,18
18:3,14 19:13 20:11
22:11,16 24:4 26:20
45:5,8,12,13,23 47:4
47:10,13,17 48:14,16
49:7,9,24 50:1 66:11
69:19 70:23 71:11
77:7 83:25 84:13
86:25 87:6,16,20,21
87:25 88:1,12,14,17
89:3,10,21,21,25
92:22 94:7 95:3 100:6
100:24 101:24 102:13
105:5
Premiere's 90:19 101:20
101:25
prepared 47:17 55:10
present 3:18 7:16 8:7
32:10 68:1 71:6 84:17
95:2
president 10:12 15:13
19:13 20:4,11 88:8,23
press 11:17 25:7 42:6,8

42:15 55:12,24 56:1
61:1
presumably 7:14
price 47:5
primarily 20:19
primary 95:23
principal 19:9
principals 30:9,10
prior 22:16 33:14,19
50:20 52:13 57:13,14
58:8,14 60:18 71:6
79:18 86:25
privilege 14:2 103:14
privileged 13:23
probably 7:7 23:17 31:6
31:21 35:11 39:24
49:2 58:23 69:20 86:4
problem 73:23 74:10
problems 57:12
proceed 6:16
proceeding 68:24
process 16:8 28:13 29:2
69:3
produce 5:8,12,17 8:18
13:7,16
produced 5:25 9:3 11:6
12:25 13:17 17:4
production 64:1,6,9
profitable 52:20,22
67:12
program 31:19
prohibits 101:20
promoted 71:5
prompt 107:9
proofs 101:23 102:8,16
102:25
properties 22:15 31:22
32:25 52:19 67:12
72:10
prospect 69:19 70:22
Prospects 69:20
provisions 8:22 85:6
proxy 41:5,14 55:9
public 1:25 3:23 83:12
106:12 109:21
publicly 55:13 60:13
61:8
pull 64:12 100:18
pulled 59:25 64:16
purchase 16:6 41:9 47:5
86:14
purposes 10:22 44:12
77:11 78:25
pursuant 5:5 7:25 10:14

55:15
put 32:21 44:1,5 98:23
P.C 3:14
p.m 3:23 106:4
— — — — —
_____
— — — — Q
qualified 31:16,25
quarter 42:20 61:2,3
quarterlies 55:5
quarters 55:20
question 18:5 24:16
27:6 28:7,9 39:6,7
41:12,18,22 42:3 44:4
46:8 51:25 57:25
58:11 60:17,19 61:12
61:14,17,19,22 62:1
64:22 70:1 72:18 74:5
78:21 80:6 83:18
87:11,13 92:21 93:4
93:24 94:1,2,13 95:9
97:5,8,13 103:23
104:1,8
questioning 13:21 68:17
questions 34:5 40:14
42:16 69:6,8 105:14
106:2
Quite 81:10
quoted 56:1
_____
— — — — R
R 5:1 21:25 35:6,13
56:21 87:2 107:1,1
rambled 86:17
rambling 72:18 96:18
ran 78:15
read 18:5,6 24:8,9 27:7
27:8 28:8,10 41:20
46:8,9 56:8,18 57:16
61:18,22,24 62:15,15
84:18 91:9 94:19
99:15 107:4,17,19,21
107:23,25 108:2,4,6,8
108:10,12,14,16,18,20
108:22,24
reading 13:5 41:11
ready 6:15 62:8 84:9
real 93:15
reality 74:4
realize 75:5
really 22:20 32:21 43:11
72:9 82:8 83:13
reason 13:11 25:2 26:7
57:11 58:22 64:16
71:2 82:8 90:7
Rebecca 18:21

recall 17:12 18:15 28:16
33:18,23 41:17,18,19
42:2 45:21 51:23 53:1
53:6 55:18 56:5 57:25
66:9,13,18 67:7,14
70:16,17,20 72:21,25
74:19,20,23,25 75:2
75:17,20 76:25 77:5
78:16 80:7,14,15,15
80:25 81:6 82:17,22
83:4 102:7
receivables 86:13
receive 25:5,14 26:10,15
26:23 47:8 56:22
104:16,17
received 12:25 25:7
26:23 27:4 56:16
58:24 59:8,8 61:1
65:21
receiving 55:19,22 56:5
recess 46:6 68:14 105:10
recognize 20:6 48:25
54:14
recollection 66:20 74:16
reconciliation 47:4
record 5:3 6:7,8 8:4
18:6 24:9 27:8,12
28:10 46:9 61:24
recoupment 85:2 95:15
recover 102:17
reduced 109:10
Ref 1:7
refer 91:22 92:5
reference 9:25 12:8,24
26:3
referenced 11:23 102:19
referred 26:1 33:22
referring 8:25 11:14
12:9 23:11 43:15
46:12 56:21 73:19
86:20
reflect 5:9,13,18 6:8 7:7
reflected 13:8 23:20
reflective 92:25
regarding 92:2,15 94:4
101:24
regardless 96:4
regular 31:18
relate 96:15 99:25
related 5:16 72:14 81:23
100:19 109:12
relates 26:16
relating 5:14
relationship 25:18 67:6
relative

109:14
release 9:21,23,25 11:17
25:7 42:6,8,15 55:12
55:24 56:1 61:1 95:22
relevant 6:13 45:18
57:10 62:20
relying 57:8 83:23,24
84:12 92:2,10,14
93:16,18 94:3 98:18
remained 23:19
remember 34:12 52:14
53:8 55:22 71:4 72:18
75:19,24 81:3,4
remnants 95:16
removed 17:20
repayment 85:20 101:11
repeat 72:3
rephrase 87:15
replaced 27:23
replacing 16:12
report 56:16 55:8,13
56:20
Reported 1:23
reporter 1:24 3:24 6:4
6:24 7:16 10:22 18:5
24:7 46:8 61:22 109:1
109:20
reporting 54:23
reports 23:16 54:19,22
54:22 55:2,19 56:17
58:17 65:21
represent 49:18 68:23
97:5,7
representative 16:17
21:18 22:9 38:16
representatives 36:11
represented 48:16,18
105:4
representing 102:5
represents 7:19
reps 91:21 100:21
request 6:1 13:16 17:18
64:1,6,9
requested 5:17 15:19
103:20
required 5:7,11 18:11
55:13 85:7
reservation 6:19,20
reserve 68:17
reserved 106:3
reserves 6:11
respect 4:7 5:3 11:6
13:14 17:13 24:16
25:6 71:21 89:20 92:3

119

99:6,8
responsibility 7:22
responsiveness 74:13
rest 34:7,10
retrospect 82:10
return 78:2 107:8
review 14:2 16:16 41:1
   41:3,5,14,24 57:9 62:9
   64:8,10 65:9,16 94:15
   94:16
reviewed 35:17 38:3
   42:5,8,22,23 60:2,13
   61:7 62:3,5,6 64:14
   86:24 92:17,19
right 6:12 11:10 12:20
   14:6,11,16 16:5 38:20
   42:18,19 46:4 48:9
   68:15,18 69:4,5 80:18
   84:24 91:7,8,12 92:12
   95:9,13 96:22 99:5
   100:18 105:1 106:1
rights 6:19,21 95:20
Robert 9:25
Robinson 3:5
room 7:13,16 34:7,10
   39:2,17 77:13 101:18
rooms 7:15
Rosen 3:14 8:6
Rotech 41:9,13,20 75:11
roughly 51:7
running 96:16,21
runs 63:12

_____ S _____
s 4:11 5:1 100:12 107:1
sale 22:16
savings 91:6
saw 60:7 69:10
says 43:24 46:14 47:3
   48:7,8,9 55:6 56:23
   58:24 59:2 86:18
   92:13 93:9 101:4
schedule 43:10,12 44:25
   45:4,6,13 46:24,25
   47:8,12,16 48:4 49:20
   50:14 51:2,14,24 53:4
   55:13 66:11 81:24
   82:23
schedules 81:15
Schilling 3:20 8:11
Scholer 2:5 7:11,19,19
scope 5:21 9:14 13:23
   63:25 65:18 103:25
   104:1
screwed 37:20 39:15

se 15:19
search 9:6
SEC 36:13
second 47:3 48:5 65:12
   94:20
section 10:15 36:13
   54:16 55:6 84:6,14,19
   85:3,9,11 86:20,23
   87:4,4,6,15 91:16,25
   92:15,25 93:10,19
   94:3,24 95:4,7,25
   101:3,14,19,20
sections 93:22
securities 55:14 83:10
security 82:15
see 18:10 19:12,25 20:8
   20:17,18 25:11,18
   36:13 43:11,12 47:6
   47:21 48:21 53:16
   65:17 67:9 73:8 86:6
seen 8:13,22
seller 37:3 73:5
selling 40:18 62:11
   73:15
send 13:2 58:19
senior 85:22,23 89:9,16
sent 9:22 10:5 25:12
   42:5 44:8 45:22 48:20
   49:1,9,12 55:24 78:10
separate 13:1,2
September 15:7 47:5,9
   48:1
served 84:17
services 1:5 9:18,19,24
   10:4,8,14,17 11:25
   12:16 14:21,21 16:3,9
   16:12 17:21 25:13
   26:13,18,19 28:25
   31:12 37:7 49:19
   73:15 85:24 88:1,10
   88:19,20 107:2
set 8:18,19,20 9:10,14
   22:18 76:2 95:14
set-off 84:24,25,25
   95:13
severally 95:2
shareholder 19:7,9
   22:14 58:18
shareholders 9:20 14:23
   18:23 19:3,11 22:10
   22:15 26:20 94:23,23
sheet 11:15 107:15
shoot 96:19
short 70:15
showed

59:13,14
shut 23:6
side 38:9 72:9
sides 24:4
sign 18:11,18 19:19 20:4
   20:8 26:2,6,7,8 37:17
   38:25 88:14 97:3,13
   97:14
signatories 79:17
signature 20:1,6,7 73:22
   86:7,9 106:3,7
signatures 30:9
signed 4:16 10:11,17
   12:17 18:19,20,22
   19:13,19 20:13 30:23
   37:13 38:19 39:9
   40:20,22,23 41:1 43:7
   44:15 45:20,22 55:17
   56:9,15 57:16 62:11
   70:1,6 72:24 73:18
   74:7 76:10 80:11 88:9
   96:8,25 99:3 107:9
silence 6:19
simple 93:15
simply 59:14 78:21
   91:15 94:2 97:16,25
   98:7 99:6
sir 8:15,25 9:4,16 14:16
   15:6,25 16:11 17:15
   18:18,19,25 19:18,24
   20:10,22 21:9,12
   23:24 25:15,20 26:4
   28:7 29:7 30:11 33:24
   34:21,24 35:2,17 36:4
   36:12 37:5,12,15
   38:19,23 40:6 41:13
   41:20 42:5,8,12,18,21
   43:9,12 44:2 45:6,25
   46:18,19,22,23 47:7
   47:11,15,20,23 48:2
   48:22 49:12,13,17,19
   51:3,8 52:7,25 53:17
   54:13,15,18,21,24
   55:1 56:7,14,18,23
   57:15,23 58:18 59:1
   60:6,17,21,24 61:20
   62:15,18 64:4 65:19
   65:23 66:3,15,17,21
   67:3,16 68:4,10 69:2
   69:12,17,21 70:20
   71:1,8,12 72:1 73:19
   73:23 74:2,11 75:4,24
   76:24 77:9 78:5,18
   79:14,19 80:10,15,17

81:3,19 82:9,18,20
   83:5,8,13,19 84:5,20
   85:3,9,18 86:8,17 88:7
   88:10,14,19 90:7,14
   90:17,22 91:3 93:8,11
   94:10,18 95:3 96:1,23
   97:24 99:15
sit 75:2 92:21 99:17,17
   100:7
six 30:14 36:13 95:19
slower 77:25,25,25
smart 37:19
smells 32:1
sold 15:7 16:7,8 17:15
   22:24,25 47:9
sole 59:4,6
solely 79:8 81:23
solvent 67:11
Somebody 97:7
Somewhat 54:21
son 34:23 59:15,18,23
   60:2,12 61:7 62:18,19
   63:20,24 64:3,6,17
soon 45:7,9 50:4 51:8
sorry 21:15 42:18 51:16
   65:10 66:4,16 70:14
   72:19,22 78:20 83:18
   87:13 104:6
sort 78:15 94:5
South 3:22
speak 23:23,25 38:9
   70:24
speaking 13:5
speaks 73:24
special 55:11
specific 33:7 43:14,15
   58:2 66:20 67:7 80:6
specifically 8:19 45:21
   50:13 51:1,23 59:1
   66:18 72:20,25 78:24
   85:21
specifics 103:24
spirit 66:23
spoke 40:15 67:20
spoken 95:18
spokesman 22:20
spring 34:2 68:10 69:12
stability 75:14
stand 103:21
standpoint 52:19 66:6
   80:2,3 82:10 87:2
stands 96:2
start 10:20
started 16:20,20 18:12

82:9
STATE 109:3
stated 16:4 78:14
statement 37:11 41:5,14
42:4 55:9 60:1,8 61:4
62:10
statements 41:24 42:10
59:14 62:4 92:18
states 1:1 85:21
stating 25:8
status 26:13 36:17
stayed 52:21
Steindler 3:14 8:6
stick 17:1
stock 15:18 16:7 17:25
17:25 29:3 30:8 83:17
86:3,12 90:19 94:22
96:13 100:25 101:17
101:21
stop 46:4 60:15 64:13
straight 31:23
strategy 28:3
Street 2:16 3:6,22
strike 87:5
strong 99:24 100:2
structure 31:5 32:22
72:1
stuck 32:12 77:2 80:16
stupid 51:16
subject 13:16 84:23
95:12
subordinate 82:7 85:19
87:17 99:1
subordinated 86:16
88:5 89:2,9 91:18
93:14 101:10
subordinating 87:5,7
subordination 78:13
85:12 90:8 91:4,10,10
91:23 92:2,12,22,24
93:17 94:6 95:17
96:24 101:4,15
SUBSCRIBED 106:8
subsequent 29:21
substance 5:25
sued 83:10
suit 102:8
Suite 2:15 3:6
summarize 82:21
supplement 6:12
supplemental 107:13
support 88:4
supposed 89:1,25 90:1
101:14
sure

18:16 23:25 24:2,4
24:12 28:20,24 36:9
38:13 45:19 47:1
48:22 51:10 52:14,18
52:21,22,24 53:9
57:12 65:13 67:2 71:7
71:8 72:4 74:21 75:1,4
75:14 92:11,11,17
100:17,19 101:22
102:13
surrounding 5:23
Swain 15:12 17:9,13,15
17:16,19 18:16,18
19:5,6,8,10 20:20,21
21:14,17 22:5,9 29:16
49:6 67:2 69:23
swear 6:24
sworn 7:1 106:8 109:8
syndicate 58:8
system 52:23,23

_____ T _____

T 3:20 107:1,1
table 38:10 39:3
Tackaberry 48:12
Taft 53:12
take 14:14 20:3 31:1
38:5 39:2,16 46:2,5
68:12 69:24 105:8
taken 1:12 3:22 5:4 6:9
7:9 109:6,9,14
takes 23:15
talk 17:3 44:7 72:6 73:8
73:10 74:6 75:8 83:14
86:19 98:2
talked 10:24 16:24
29:23,24 35:4 40:3,11
40:16 44:6 49:15 52:8
52:9,15 53:9 66:21
69:8 71:6 77:11,22
93:13
talking 23:1 31:21 32:3
60:10 67:21 72:12
81:1 82:19,23
tax 66:6 77:10 78:25
Taylor 2:11 3:3 5:2 6:6
7:12 10:21 11:5,10,18
12:4,13,20,22 13:4,10
13:13,19,25 14:8,11
19:21 25:25 26:21
27:5 32:6 33:16 34:20
35:16 36:3 38:13
41:17,21 42:1 43:5,18
44:22 46:1,21 47:19
52:4 53:22 55:21

57:24 59:12,20 60:5
60:15 61:11,16,25
64:21,25 65:10,12
68:13,20 70:9 71:14
73:3 83:20 84:3 87:9
87:19 89:4,11,22 91:1
91:20 92:4 93:2,21
94:9 96:20 98:13
99:12,22 100:9,14,16
102:1,11,20 103:3,13
103:22 104:12,21,24
105:12 106:1
telephone 27:15 29:23
29:25 39:3,17 40:4
64:20 70:24 71:9,21
71:24 72:21 73:12
74:17,19 75:22
tele-copier 11:15
tell 15:3 17:12 28:25
34:1 50:19 52:2 57:22
73:6 84:9 99:2 103:6
telling 27:2 37:3,25 53:3
term 15:9 16:2 67:18
95:25
terminology 73:25
terms 7:22 34:25 35:10
43:15 73:8 76:3,6 99:9
103:10,11 104:9,10,18
testified 7:1 33:11 69:10
93:22
testify 103:15
testifying 60:12
testimony 6:12 76:1
80:5 109:7,9
Texas 2:17 91:11
text 13:5
Thank 14:13 69:7
themself 70:25 81:1
thereof 13:17
thereon 85:16 101:8
thereto 5:16 109:16
thing 16:10 25:10 36:12
45:20 60:22 72:4 73:9
74:5 77:8,16 82:4 86:4
90:22 96:9,10 97:23
things 23:16 91:22 95:6
think 7:6,18 10:23 14:6
16:18 31:3 32:12
42:12 51:3 56:22 71:2
75:1 79:19 82:10
89:19 95:9 103:19
third 61:13
thought 76:7
three 8:21,24 9:1,11,15

42:18 53:13 85:3,10
85:11 86:23 91:13
94:10,17 101:15
time 6:1,9 7:5 15:4 20:2
20:3,12 23:1,9,11,15
23:25 24:24 34:4,6,8,9
36:20 50:4 61:13
68:16 69:18 70:15
71:10 73:10 76:10,13
79:23 80:20,21,23
81:12 96:19
timely 84:18
times 29:8,23,24,25
30:14 32:19 40:4,16
72:3 97:23
today 8:14 75:2 92:11
92:21 99:17,18 100:7
101:16,18
today's 5:21 8:8
told 18:7 30:14 36:17,22
39:21,24 40:16,19
50:18,20,22,25 51:16
51:23 66:10 71:15
73:13 74:21 75:20
77:6 80:15
top 25:11
topic 81:19
trading 32:25
transaction 23:20 24:5
52:13 76:12 77:7,12
80:13,25 84:1 87:1
transcript 6:3 7:7
transcripts 11:7
treated 91:5
trend 81:16
tried 72:6
TRO 78:4,8,19
trouble 74:7
Troy 18:22
true 56:11 71:12
truly 32:21 43:11
trust 21:7,19 22:1,18,20
22:20 24:19 33:3
34:19 35:7 57:6 63:22
trustee 15:21 35:6,12
trustees 22:19
truthfully 34:1
try 33:7 42:17 43:14
trying 23:5 29:2 71:1
turn 19:16,23 34:14
46:11 54:16 68:16
two 8:20,24 9:1,11,15
11:7 16:4 21:2 23:23
23:25 24:13 29:18

121

30:9 32:20,24 43:16
  48:20 49:17 50:25
  68:12 84:19,20 86:6
  95:7 98:23 99:3,5
  100:2 101:3 105:8
type 25:9 67:6
types 40:8
typewriting 109:11
typically 73:4 75:8

_____ U _____
Uh-huh 63:11
unconditionally 84:16
  84:21,23 95:1,7,12
underneath 46:15 48:8
understand 6:18 7:14
  23:5 24:12 31:17 69:1
  71:20 80:5 87:16
  88:25 89:8
understanding 19:11
  56:12 76:3 87:3,6,24
  89:14 91:3,18
unencumbered 18:1
  33:1
UNITED 1:1
Unsecured 3:12
upstream 78:7
use 20:9 107:12

_____ V _____
value 86:10
various 55:19
viable 23:4
vice 10:12 88:8,23
video 1:11 2:2,11 3:11
  3:21 7:9
view 83:15
Village 63:9,10
visit 26:24 27:9,15 28:16
vis-a-vis 91:19
VP 10:18

_____ W _____
Wait 23:3 82:4
waiver 95:19
waives 95:20
Walrath 5:4
Walrath's 5:5 104:2
want 24:13 27:12 52:6
  61:20 64:20 77:9,10
  78:25 86:3 89:24
  93:15
wanted 31:15,25 44:25
  52:21,22 72:4 98:5
wanting 31:9

warranties 36:11
  100:21
Washington 69:16
wasn't 59:21
wasting 34:8
way 14:7 17:16 60:21
  64:11 78:11 86:15
  93:10 99:23 104:25
weather 52:8
went 24:3 37:2,7 38:1
  38:24 58:22 64:3,5
  66:6 78:23 79:3 82:12
  90:21 96:11
we'll 17:2 27:1 45:14
whatsoever 35:3
willing 79:1,4
Wingate 3:22
Winston-Salem 1:12 3:7
  3:22 7:13 63:19 78:9
  91:12
wish 107:6
withdraw 28:23
withheld 13:24 14:1
witness 4:2 14:16 18:7
  26:1,22 27:6,9 28:11
  32:7 34:21 35:17 36:4
  38:15 41:19 42:4 43:7
  43:20 44:24 46:22
  47:20 52:7 53:24
  55:22 58:2 59:13,21
  60:6,16,20 61:20 62:2
  65:4,14 70:10 71:15
  73:4 84:5 87:12,20
  89:5,12,23 91:2,21
  92:5 93:6 94:10 96:21
  98:14 99:13,23 100:10
  100:15,17 102:2,12,21
  103:4,17 104:4,14,25
  105:7 106:7 109:7,9
word 37:20
words 17:23 37:2 77:10
  78:12 95:13
work 18:25 20:9 31:20
  62:18,19,21 63:6,8,18
  worked 24:4 27:21 66:1
working 16:22 103:5
worth 59:16,16
wouldn't 40:21,23,24
  101:16
write 24:24 25:2 53:20
  107:7
write-off 40:19 57:15,18
  62:7 73:14
writing 81:8
writings

27:3,14
written 26:15,23 53:15
wrong 37:17 69:11
  73:11 78:22 81:21
wrongdoing 94:5
wrote 53:18,20,23 54:1

_____ Y _____
Yankees 64:13
yeah 34:21 62:22 76:16
  98:5
year 55:25 67:19
years 15:10 27:22 47:13
  55:8 75:6
York 2:7,7 3:16,16 7:11
  72:7 91:11

_____ S _____
$100,000 15:10
$15,000,000 51:7
$205,000,000 37:12
  40:19 57:15 62:7
$35,000,000 56:2

_____ 0 _____
00-389(MFW) 1:5
02/27/98 4:10
03/04/98 4:12
03/31/98 4:14

_____ 1 _____
1 4:7 5:10 6:2,5 8:3,14
  8:16 55:16 72:24
1:00 3:23
10K 36:15 41:3,25 54:19
  54:22 55:8 56:6,16,22
  57:12 59:10
10Ks 57:17
10Q 55:2,19 58:17,24
10Qs 55:4 57:17 58:19
  58:20 59:11
10022 2:7
10169 3:16
11 1:4 4:10,12 54:17
11-25-06 109:25
11435 1:7
12 4:14,15,17 42:24,25
125 3:22
14 4:18
155 57:21
1600 2:15
17 62:11 73:15
19.5 16:6
19197 59:11
1990 72:24

1992 21:8
1994 15:7 17:16 23:7
  47:5,9 48:1
1996 36:18 41:3,25 55:9
  56:2,6,16 59:10 60:22
1997 5:11 41:7,16 42:20
  42:24 55:11,12,16,20
  55:25 56:17 58:25
  60:6,22 61:2 62:3 70:5
  70:21 74:18
1998 9:17,22 10:7,10,16
  11:2,19,25 12:10,17
  14:20 23:12,19 25:8
  26:17 28:17,18,22
  33:9,15,20,25 43:4
  44:14 50:2 55:18 58:8
  58:14 60:4,7,11,11,14
  60:21,23 62:3 68:9
  69:11,16 70:2,5,7,19
  70:21,23 71:11,23,23
  76:11,12,21,21 79:18
  79:21,22 80:6,7,12,13
  80:24,25 81:7,7,22,22
  82:22,22 83:6,7 87:1
  94:19 98:3

_____ 2 _____
2 4:9 5:5,11 11:3,4,10
  14:15,18 17:2,6,14
  19:17 21:16 22:6
  23:10,21 24:11,16,23
  25:6,17,19,20,21,24
  26:2,9 27:10 28:13
  30:25 42:12,13 50:2
2.1 37:8 38:24 40:22
  57:13,19 62:4 73:16
  85:22 86:1 90:17
  96:12
2.5 73:14
20 41:6,16 55:11 106:9
2000 5:11
2005 1:13 3:23 5:6
21 1:13 55:12
21st 3:23
212 2:8
214 2:18
230 3:15
24 21:7 43:25 46:14,16
25 10:10 12:10,17 76:12
  76:21 79:18,22 80:7
  80:13,25 81:7,22
  82:22 83:6 87:1 98:3
25th 94:18 98:25
27 9:17 11:2 14:20 26:17
  28:17,18,22

27103-1835 3:7
28 47:5,9
─── 3 ───
3 4:11 11:13,20,21 25:10
  25:11 26:11,14 42:11
  42:13,19
3/31/1998 74:18
3/31/98 75:23
30 15:10 29:12
31 10:7,16 11:25 33:9,15
  33:20,25 42:20,24
  43:4 44:14 55:9 56:6
  58:8,14 60:11,14 68:9
  70:2,7,18,23 71:11,23
  76:11,21 79:21 80:6
  80:12,24 81:7,21
  82:22 83:6
31st 31:6 44:9 58:5
336 3:8
336-945-6112 65:4
370 3:6
─── 4 ───
4 4:13 9:22 11:19 12:3,5
  12:6 23:21 25:8 31:1,2
  31:3,6 34:14,16 35:15
  37:24 43:3 44:14
  45:23 69:25 79:16
  100:20
4th 25:15,15 42:5 55:24
4:05 106:4
425 2:6
45 29:12 33:13
─── 5 ───
5 4:15 12:11,12,14 23:22
  84:10,11 86:21 91:17
  91:25 93:1,7,19 94:3
  96:3 97:10 98:8,18
  99:11,21 100:5,12
─── 6 ───
6 4:8,16 12:18,19,21
  100:10,12
6.4 15:23,24 41:11 54:16
  55:6 58:24
6.5 36:21,22
6.6 36:25
6.7 36:25
600 3:6
631-8500 3:8
68 4:4 19:17,18
68s 19:21,24
69 19:18,19

698-2100 2:18
─── 7 ───
7 4:3,18 14:9,10,12
700 2:16
75201 2:17
─── 8 ───
8 19:20
836-7024 2:8
─── 9 ───
96 54:10
97 69:21 71:22 72:23
  75:23
98 34:2 60:25 61:3 62:10
  68:10 69:21
99 78:2,11